# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

——————————————————————x
:
LINDA SMITH, Individually and On Behalf Of     :     Civil Action No. _____
All Others Similarly Situated,                 :
                                               :
          Plaintiff,                           :     **CLASS ACTION COMPLAINT**
                                               :     **FOR EXCESSIVE FEES IN**
          vs.                                  :     **VIOLATION OF SECTIONS**
                                               :     **34(b), 36(b) AND 48(a) OF THE**
THE HARTFORD FINANCIAL SERVICES                :     **INVESTMENT COMPANY ACT**
GROUP, INC., THE HARTFORD MUTUAL               :     **AND SECTIONS 206 AND 215 OF**
FUNDS, INC., THE HARTFORD MUTUAL               :     **THE INVESTMENT ADVISERS**
FUNDS II, INC., HARTFORD INVESTMENT            :     **ACT, AND FOR BREACHES OF**
FINANCIAL SERVICES, LLC, HARTFORD              :     **FIDUCIARY DUTY**
INVESTMENT MANAGEMENT COMPANY,                 :
WELLINGTON MANAGEMENT COMPANY,                 :
LLP, WINIFRED E. COLEMAN, THOMAS M.            :
MARRA, WILLIAM A. O'NEILL, MILLARD H.          :     **JURY TRIAL DEMANDED**
PRYOR, JR., LOWNDES A. SMITH, JOHN K.          :
SPRINGER, DAVID M. ZNAMIEROWSKI and            :
JOHN DOES 1-100,                               :
                                               :
          Defendants,                          :
                                               :     February 27, 2004
                                               :
——————————————————————x
**[Caption continues on next page]**
——————————————————————x

HARTFORD ADVISERS FUND, HARTFORD          :
CAPITAL APPRECIATION FUND,                :
HARTFORD DISCIPLINED EQUITY FUND,         :
HARTFORD DIVIDEND AND GROWTH              :
FUND, HARTFORD EQUITY INCOME FUND,        :
HARTFORD FOCUS FUND, HARTFORD             :
GLOBAL COMMUNICATIONS FUND,               :
HARTFORD GLOBAL FINANCIAL SERVICES        :
FUND, HARTFORD GLOBAL HEALTH FUND,        :
HARTFORD GLOBAL LEADERS FUND,             :
HARTFORD GLOBAL TECHNOLOGY FUND,          :
HARTFORD GROWTH FUND, HARTFORD            :
GROWTH OPPORTUNITIES FUND,                :
HARTFORD HIGH YIELD FUND, HARTFORD        :
INCOME FUND, HARTFORD INFLATION           :
PLUS FUND, HARTFORD INTERNATIONAL         :
CAPITAL APPRECIATION FUND,                :
HARTFORD INTERNATIONAL                    :
OPPORTUNITIES FUND, HARTFORD              :
INTERNATIONAL SMALL COMPANY FUND,         :
HARTFORD MIDCAP FUND, HARTFORD            :
MIDCAP VALUE FUND, HARTFORD MONEY         :
MARKET FUND, HARTFORD SHORT               :
DURATION FUND, HARTFORD SMALL             :
COMPANY FUND, HARTFORD SMALLCAP           :
GROWTH FUND, HARTFORD STOCK FUND,         :
HARTFORD TAX-FREE NEW YORK FUND,          :
HARTFORD TAX-FREE CALIFORNIA FUND,        :
HARTFORD TAX-FREE MINNESOTA FUND,         :
HARTFORD TAX-FREE NATIONAL FUND,          :
HARTFORD TOTAL RETURN BOND FUND,          :
HARTFORD U.S. GOVERNMENT                  :
SECURITIES FUND, HARTFORD VALUE           :
FUND, and HARTFORD VALUE                  :
OPPORTUNITIES FUND (collectively, the     :
"Hartford Funds"),                        :
                                          :
            Nominal Defendants.           :
                                          :
———————————————————————————————x

Plaintiff Linda Smith, by and through her counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media reports, news articles, academic literature, and academic studies.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of investors in mutual funds belonging to The Hartford Financial Services Group, Inc. ("Hartford Financial" or "Hartford") family of mutual funds (the "Hartford Funds"), and derivatively on behalf of the Hartford Funds, against the Hartford Funds investment advisers, their corporate parents and the Hartford Funds directors.

2.      This complaint alleges that the Investment Adviser Defendants (as defined herein) drew upon the assets of the Hartford Funds to pay brokers to aggressively push Hartford Funds over other funds, and that the Investment Adviser Defendants concealed such payments from investors by disguising them as brokerage commissions.  Such brokerage commissions, though payable from fund assets, are not disclosed to investors in the Hartford Funds public filings or elsewhere.

3.      Thus Hartford Funds investors were induced to purchase Hartford Funds by brokers who received undisclosed payments from the Investment Adviser Defendants to push Hartford Funds over other mutual funds and who therefore had an undisclosed conflict of interest.  Then, once invested in one or more of the Hartford Funds, Hartford Funds investors were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push Hartford Funds to yet other brokerage clients.

1

4.    The Investment Adviser Defendants were motivated to make these secret payments to finance the improper marketing of Hartford Funds because their fees were calculated as a percentage of funds under management and, therefore, tended to increase as the number of Hartford Funds investors grew.  The Investment Adviser Defendants attempted to justify this conduct on the ground that by increasing the Hartford Funds assets they were creating economies of scale that inured to the benefit of investors but, in truth and in fact, Hartford Funds investors received none of the benefits of these purported economies of scale.  Rather, fees and costs associated with the Hartford Funds steadily increased during the Class Period (as defined herein), in large part because the Investment Adviser Defendants continued to skim from the Hartford Funds to finance their ongoing marketing campaign.  The Hartford Funds Directors, who purported to be Hartford investor watchdogs, knowingly or recklessly permitted this conduct to occur.

5.    By engaging in this conduct, the Investment Adviser Defendants, and the defendant entities that control them, breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Sections 206 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), breached their common law fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to their clients.  The Investment Adviser Defendants also violated Section 34(b) of the Investment Company Act because, to further their improper campaign, they made untrue statements of material fact in fund registration statements, and material omissions, with respect to the procedure for determining the amount of fees payable to the Investment Adviser Defendants and with respect to the improper uses to which the fees were put.  Additionally, the Hartford Funds Directors breached their common law fiduciary duties to the

2

Hartford Funds investors by knowingly or recklessly allowing the improper conduct alleged herein to occur and harm Hartford Funds investors.

6.      On January 28, 2004, the *Los Angeles Times* published an article about a Senate committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the panel, comparing the scandal-plagued industry to "a $7-trillion trough" exploited by fund managers, brokers and other insiders.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, and common law.

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

9.      Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.  Defendant Hartford Financial was at all relevant times, and still is, headquartered in this District.

10.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff Linda Smith ("Plaintiff") purchased during the Class Period and continues to own shares or units of the Hartford Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap Class A Fund and has been damaged by the conduct alleged herein.

12.     Defendant Hartford Financial is a Connecticut financial services company with its principal place of business at Hartford Plaza, 690 Asylum Avenue, Hartford, Connecticut 06115.

13.     The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (collectively, the "Companies") are open-end management investment companies consisting of twenty-seven and seven separate investment portfolios or mutual funds (each a "Fund" and together the "Funds"), respectively.  Defendant The Hartford Mutual Funds, Inc. ("Hartford Funds, Inc.") is a wholly-owned subsidiary of Hartford Financial, with its principal place of business at 690 Asylum Avenue, Hartford, Connecticut 06115.  Hartford Funds Inc. manages approximately 27 investment portfolios, including all Hartford Funds except those managed by The Hartford Mutual Funds II, Inc. ("Hartford Funds II").

14.     Defendant Hartford Funds II is a wholly-owned subsidiary of Hartford Financial, with its principal place of business at P.O. Box 64284, St. Paul, Minnesota 55164-0387. Hartford Funds II manages the Growth Fund, Growth Opportunities Fund, SmallCap Growth Fund, Tax-Free Minnesota Fund, Tax-Free National Fund, U.S. Government Securities Fund and Value Opportunities Fund.

15.     Defendant Hartford Investment Financial Services, LLC (''HIFSCO'') is the investment manager to each fund. HIFSCO is a wholly-owned indirect subsidiary of Hartford Financial. HIFSCO had over $14.4 billion in assets under management as of December 31, 2002. HIFSCO is responsible for the management of each fund and supervises the activities of the

4

investment sub-advisers described below. HIFSCO is principally located at 200 Hopmeadow Street, Simsbury, Connecticut 06089.

16.     Defendant Hartford Investment Management Company (''HIMCO'') is a professional money management firm that provides services to investment companies, employee benefit plans and insurance companies. HIMCO is a wholly-owned subsidiary of Hartford Financial. As of December 31, 2002 HIMCO and its wholly-owned subsidiary had investment management authority over approximately $88.5 billion in assets. HIMCO is principally located at 55 Farmington Avenue, Hartford, Connecticut 06105.

17.     Defendant Wellington Management Company, LLP (''Wellington Management'') is the investment sub-adviser to each of the funds, other than those sub-advised by HIMCO. Wellington Management, a Massachusetts limited liability partnership, is a professional investment counseling firm that provides services to investment companies, employee benefit plans, endowments, foundations and other institutions and individuals. Wellington Management and its predecessor organizations have provided investment advisory services since 1928. As of December 31, 2002 Wellington Management had investment management authority over approximately $303 billion in assets. Wellington Management is principally located at 75 State Street, Boston, Massachusetts 02109.

18.     HIFSCO, HIMCO and Wellington Management are referred to collectively herein as the "Investment Adviser Defendants."

19.     The Investment Adviser Defendants are registered as investment advisers under the Investment Advisers Act.  Fees payable to the Investment Adviser Defendants are calculated as a percentage of fund assets under management.  The Investment Adviser Defendants had ultimate responsibility for overseeing the day-to-day management of the Hartford Funds.

5

20.     Defendants Winifred E. Coleman ("Coleman"), Thomas M. Marra ("Marra"), William A. O'Neill ("O'Neill"), Millard H. Pryor, Jr. ("Pryor"), Lowndes A. Smith ("Smith"), John K. Springer ("Springer"), and David M. Znamierowski ("Znamierowski") were directors of the Companies, which includes the Hartford Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap Class A Fund, during the Class Period. Defendant Coleman can be contacted at 27 Buckingham Lane, West Hartford, Connecticut 06117; defendant Marra, at P.O. Box 2999, Hartford, Connecticut 06104-2999; defendant O'Neill, at Box 360, East Hampton, Connecticut 06424; defendant Pryor, at 695 Bloomfield Avenue, Bloomfield, Connecticut 06002; defendant Springer, at 225 Asylum Avenue, Hartford, Connecticut 06103; defendant Smith, at P.O. Box 2999, Hartford, Connecticut 06104-2999; and defendant Znamierowski, at 55 Farmington Avenue, Hartford, Connecticut 06105. Additionally:

(a)     Smith was a director of the Companies during the Class Period. He also has served as Vice Chairman of Hartford since February 1997, as President and Chief Executive Officer of Hartford Life, Inc. since February 1997, and as President and Chief Operating Officer of The Hartford Life Insurance Companies since January 1989.

(b)     Marra was a director of the Companies during the Class Period. He also has served as Chairman of the Board of the Companies since 2002 and President and Chief Operating Officer of Hartford Life, Inc.  He is also a member of the Board of Directors and a member of the Office of the Chairman for The Hartford Financial Services Group, Inc., the parent company of Hartford Life.  He was named President of Hartford Life in 2001 and COO in 2000.  Marra served as Director of Hartford Life's Investment Products Division from 1998 to 2000.  Marra is also a Managing Member and President of HIFSCO.  He currently oversees 75 portfolios in the Hartford Funds complex.

(c)     Znamierowski was a director of the Companies during the Class Period. He also served as Senior Vice President, Chief Investment Officer and Director of Investment Strategy for Hartford Life, Inc. during the Class Period.

(d)     In 2000, defendants Coleman, O'Neill, Pryor and Springer served on boards charged with supervising 39 portfolios.  In the fiscal year ending October 31, 2000, Clark, Coleman, O'Neill, Pryor and Springer each received compensation of $37,750 for their service as the Companies directors.

21.     Defendants John Does 1-100 were the Companies directors during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of Plaintiff's counsel's ongoing investigation.

22.     Coleman, Marra, O'Neill, Pryor, Smith, Springer, and Znamierowski, and John Does 1-100 are referred to collectively herein as the "Director Defendants."

23.     Nominal defendants the Hartford Funds, as identified in the caption of this complaint and on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of Directors charged with representing the interests of the shareholders in one or a series of the funds.  The Hartford Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.     Plaintiff brings certain of these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased, redeemed or held shares or like interests in any of the Hartford Funds between February 27, 1999 and January 9, 2004 inclusive, and who were damaged thereby (the "Class").

Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are many thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hartford and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Investment Company Act was violated by defendants' acts as alleged herein;

(b)     whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

(c)     whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(d)     whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Hartford Funds; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Director Defendants Breached Their
### Fiduciary Duties To Hartford Funds Investors

32.     Hartford public filings state that the board of directors for each Hartford trust is responsible for the management and supervision of each portfolio, or fund, comprising the trust. In this regard, the most recent Statement of Additional Information for funds offered by The Hartford Mutual Funds, Inc. (the "Statement of Additional Information"), which includes the Hartford Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap Class A Fund, which is available to the investor upon request is typical of the Statements of Additional Information available for other Hartford Funds.  It states that "[E]ach Company has a board of directors, who elect officers who are responsible for the day-to-day operations of the Funds and who execute policies formulated by the directors."

33.     Moreover, the Statement of Additional Information for The Hartford Mutual

Funds, Inc. dated March 1, 2003 stated, with respect to the duties of the Directors, as follows:

> In accordance with the terms of the [Distribution] Plans, HIFSCO provides to each Fund, for review by the applicable Company's board of directors, a quarterly written report of the amounts expended under the respective Plans and the purpose for which such expenditures were made. ***In the board of directors' quarterly review of the Plans, they review the level of compensation the Plans provide in considering the continued appropriateness of the Plans.***
>
> The Plans were adopted by a majority vote of the board of directors of the applicable Company, including at least a majority of directors who are not, and were not at the time they voted, interested persons of the applicable Funds as defined in the 1940 Act and do not and did not have any direct or indirect financial interest in the operation of the Plans, cast in person at a meeting called for the purpose of voting on the Plans. ***In approving the Plans, the directors identified and considered a number of potential benefits which the Plans may provide including the potential to increase assets in order to benefit from economies of scale. The board of directors of the applicable Company believes that there is a reasonable likelihood that the Plans will benefit each applicable Fund and its current and future shareholders.*** Under their terms, the Plans remain in effect from year to year provided such continuance is approved annually by vote of the directors of the applicable board in the manner described above. The Plans may not be amended to increase materially the amount to be spent for distribution without approval of the shareholders of the Fund affected thereby, and material amendments to the Plans must also be approved by the applicable board of directors in the manner described above. A Plan may be terminated at any time, without payment of any penalty, by vote of the majority of the directors of the applicable board who are not interested persons of the Funds and have no direct or indirect financial interest in the operations of the Plan, or by a vote of a "majority of the outstanding voting securities" of the Fund affected thereby. A Plan will automatically terminate in the event of its assignment.

[Emphasis added.]

34.     Another section of the Statement of Additional Information sets forth in greater

detail the purported process by which the investment managers are selected:

At a meeting of the Board of Directors on August 1, 2002, the Board unanimously voted to approve, or renew, as the case may be, the investment management agreement, investment sub-advisory agreement and investment services agreement. ***In this regard, the Board of Directors considered several factors relating to the agreements, including the following factors.*** The Board reviewed the quality of the services provided to the Funds by HIFSCO, Wellington Management and HIMCO, including each Fund's performance relative to an appropriate benchmark as well as compared to the Fund's appropriate peer group. ***The Board also reviewed the investment management fees paid to HIFSCO and by HIFSCO to Wellington Management and HIMCO. In this connection, the Board reviewed comparative information on investment management fees paid and expenses incurred by similarly situated funds. The Board considered the fact that all of the Funds provide for fee breakpoints that gradually decrease as assets increase.*** The Board considered other benefits to HIFSCO or its affiliates from the investment management agreement with the Funds. Specifically, the Board reviewed information noting that Hartford Life, Inc. receives a set fee for fund accounting and related services. In addition, it was noted that Hartford Life, Inc. and its affiliates may benefit from directed brokerage programs which are intended to recognize sales of fund shares made by various broker dealers. Such programs help to increase asset levels in the Funds which can increase revenue paid to HIFSCO and its affiliates. ***Finally, the Board reviewed information regarding the costs of providing advisory services to the Funds, and the resulting profits. Based upon its review, the Board concluded that it is in the interest of the Funds and their shareholders for the Board to approve, or renew, as the case may be, the existing investment management agreement, investment sub-advisory agreement and investment services agreement for the Funds.***

In arriving at their decision to approve the renewal of each of the agreements, the board of directors of each Company did not assign relative weights to the factors discussed above or deem any one or group of them to be controlling in and of themselves.

The investment management agreements, investment sub-advisory agreements and investment services agreements continue in effect for two years from initial approval and from year to year thereafter if approved annually by a vote of a majority of the directors of the applicable Company, including a majority of the directors who are not parties to an agreement or interested persons of any party to the agreement, cast in person at a meeting called for the purpose of voting on such approval, or by holders of a majority of the applicable Fund's outstanding voting securities. The

agreements automatically terminate upon assignment as defined under the 1940 Act. The investment management agreements may be terminated without penalty on 60 days' notice at the option of either party to the respective contract or by vote of the holders of a majority of the outstanding voting securities of the applicable Fund. The investment subadvisory agreements may be terminated at any time without the payment of any penalty by the board of directors of the applicable Company or by vote of a majority of the outstanding voting securities of the applicable Fund, by HIFSCO upon written notice to Wellington Management, and, with respect to each applicable Fund, by Wellington Management upon 90 days' written notice to HIFSCO. The investment services agreements may be terminated at any time without the payment of any penalty by the board of directors of the applicable Company, or by vote of a majority of the outstanding voting securities of the applicable Fund, by HIFSCO upon 60 days' notice to HIMCO and, with respect to each applicable Fund, by HIMCO upon 90 days' written notice to HIFSCO. The investment subadvisory agreements and investment services agreements also terminate automatically upon the termination of the corresponding investment management agreement.

[Emphasis added.]

35.     The Investment Company Institute ("ICI"), of which Hartford Financial is a member, recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure.  In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

***Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.***

***In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its***

> *shareholders differ from the interests of its investment adviser or management company.*

[Emphasis added.][1]

36.     In truth and in fact, the Companies boards of directors, *i.e.* the Director Defendants, were captive to and controlled by Hartford Financial and the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Hartford Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming Hartford Funds assets.  In many cases, key Hartford Funds Directors were employees or former employees of the Investment Adviser Defendants and were beholden for their positions, not to Hartford Fund investors, but, rather, to the Investment Adviser Defendants they were supposed to oversee.  The Director Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed purportedly independent committees, charged with responsibility for billions of dollars of fund assets (comprised largely of investors' college and retirement savings).

37.     To ensure that the Directors toed the line, the Investment Adviser Defendants often recruited key fund Directors from the ranks of investment adviser companies and paid them excessive salaries for their service as Directors.  For example, Marra, the Chairman of Hartford Financial and Managing Member and President of HIFSCO, is also the Director and/or officer of 75 registered investment companies in the Hartford Fund complex, including Hartford Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap Class A

---

[1]     The ICI describes itself as the national association of the U.S. investment company industry.  Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts.  Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets.  The quotation above is excerpted from a paper entitled *Understanding the Role of Mutual Fund Directors,* available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

Fund.  All other Directors responsible for management of the Companies oversaw between 51

and 75 portfolios in the Hartford Fund complex.

38.     In exchange for creating and managing the Hartford Funds, including the Hartford

Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap

Class A Fund, the Investment Adviser Defendants charged the Hartford Funds a variety of fees,

each of which was calculated as a percentage of assets under management.  Hence, the more

money invested in the funds, the greater the fees paid to Hartford.  In theory, the fees charged to

fund investors are negotiated at arm's-length between the fund board and the investment

management company and must be approved by the independent members of the board.

However, as a result of the Director Defendants' dependence on the investment management

company, and its failure to properly manage the investment advisers, millions of dollars in

Hartford Funds assets were transferred through fees payable from Hartford Funds assets to the

Investment Adviser Defendants that were of no benefit to fund investors.

39.     As a result of these practices, the mutual fund industry was enormously profitable

*for Hartford.*  In this regard, another *Forbes* article, published on September 15, 2003, stated as

follows:

> The average net profit margin at publicly held mutual fund firms was
> 18.8% last year, blowing away the 14.9% margin for the financial industry
> overall . . . . [f]or the most part, customers do not enjoy the benefits of the
> economies of scale created by having larger funds.  ***Indeed, once a fund
> reaches a certain critical mass, the directors know that there is no
> discernible benefit from having the fund become bigger by drawing in
> more investors; in fact, they know the opposite to be true - once a fund
> becomes too large it loses the ability to trade in and out of positions
> without hurting its investors.*** [. . .]
>
> ***The [mutual fund] business grew 71-fold (20 fold in real terms) in the
> two decades through 1999, yet costs as a percentage of assets somehow
> managed to go up 29%. . . .***   Fund vendors have a way of stacking their
> boards with rubber stamps.  As famed investor Warren Buffett opines in
> Berkshire Hathaway's 2002 annual report: 'Tens of thousands of

"independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never." [Emphasis added.]

40. Plaintiff and other members of the class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using so-called 12b-1 fees, directed brokerage (as defined below) and commissions to improperly siphon assets from the funds.

**The Investment Adviser Defendants Used**
**<u>Rule 12b-1 Marketing Fees For Improper Purposes</u>**

41. Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions require that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that ***there is a reasonable likelihood that the plan will benefit the company and its shareholders.***" [Emphasis added.]

15

42.     The exceptions to the Section 12b prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Director Defendants authorized, and the Investment Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

43.     However, the purported Rule 12b-1 fees charged to Hartford Funds investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Hartford Funds investors.  Rather, Hartford Funds management and other fees steadily increased and this was a red flag that the Director Defendants knowingly or recklessly disregarded.  If anything, the Hartford Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance.  If the Director Defendants reviewed written reports of the amounts expended pursuant to the Hartford Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required — which seems highly unlikely under the circumstances set forth herein — the Director Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing Hartford Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Hartford Funds investors.

16

44.     Moreover, at least three of the Hartford Funds were closed to new investors ("the Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been used to market and distribute them.  Nevertheless, the Investment Adviser Defendants received Rule 12b-1 fees charged to the Closed Funds.  The Closed Funds that charged such Rule 12b-1 fees are: Hartford MidCap Funds A, B and C.

45.     As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the Hartford Funds Rule 12b-1 plan.

**The Investment Adviser Defendants Charged Their
Overhead To Hartford Funds Investors And Secretly Paid
Excessive Commissions To Brokers To Steer Clients To Hartford Funds**

46.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined *in good faith* that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) [Emphasis added.]  In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the

money manager in the performance of his investment decision-making responsibilities."  The

commission amounts charged by brokerages to investment advisers in excess of the purchase and

sale charges are known within the industry as "Soft Dollars."

47.     The Investment Adviser Defendants went far beyond what is permitted by the

Section 28(e) safe harbor.  The Investment Adviser Defendants used Soft Dollars to pay

overhead costs (for items such as computer hardware and software) thus charging Hartford

Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with

the investment advisers' fiduciary duties, properly should have been borne by the Investment

Adviser Defendants.  The Investment Adviser Defendants also paid excessive commissions to

broker dealers on top of any real Soft Dollars to steer their clients to Hartford Funds and directed

brokerage business to firms that favored Hartford Funds.  Such payments and directed-brokerage

payments were used to fund sales contests and other undisclosed financial incentives to push

Hartford Funds.  These incentives created an undisclosed conflict of interest and caused brokers

to steer clients to Hartford Funds regardless of the funds' investment quality relative to other

investment alternatives and to thereby breach their duties of loyalty.  By paying the excessive

brokerage commissions, the Investment Adviser Defendants additionally violated Section 12 of

the Investment Company Act, because such payments were not made pursuant to a valid Rule

12b-1 plan.

48.     The excessive commissions did not fund any services that benefited the Hartford

Funds shareholders.  This practice materially harmed Plaintiff and other members of the Class

from whom the Soft Dollars and excessive commissions were taken.

49.     Additionally, on information and belief, Hartford, similar to other members of the

industry, have a practice of charging lower management fees to institutional clients than to

ordinary mutual fund investors through their mutual fund holdings.  This discriminatory

treatment cannot be justified by any additional services to the ordinary investor and is a further breach of fiduciary duties.

### THE TRUTH BEGINS TO EMERGE

50.     On January 9, 2004, the *Wall Street Journal* revealed a revenue-sharing scheme between Edward Jones and Hartford, as well as six other mutual fund companies, where the companies paid Edward Jones substantial amounts to favor those companies when pitching funds to customers.  In an article, the *Wall Street Journal* detailed Edward Jones' wrongdoing based on an investigation that included interviews with 18 former and current Edward Jones brokers.

51.     According to the article, the pressure to sell the preferred funds made it financially foolhardy for Edward Jones brokers to sell non-preferred funds.  Quoting brokers who had sold only the preferred funds for years, the article reported as follows:

> Individual brokers have a strong financial incentive to pitch favored funds.  The revenue-sharing payments are credited as income to the profit-and-loss statements of brokerage branches. Those statements are a significant factor in determining the size of brokers' bonuses, generally awarded three times a year, according to former brokers.  The bonuses can add up to $80,000 or $90,000 for a good producer, and often average about a third of total compensation.

> ***"I sold no outside funds,"*** says former broker Eddie Hatch, who worked at Jones in North Carolina for 13 years, until he left in 2000 to work for another brokerage firm.  ***"You took a reduced payout"*** *if you sold funds not on the preferred list, he adds*.

> Jones floods its brokers with literature from its preferred funds, former brokers say.  "I didn't take the blinders off for nine years," says Scott Maxwell of Cary, N.C., a broker who left Jones for another firm in March of last year.  He switched jobs, he says, largely because he was uncomfortable with the limited fund selection.  Mr. Maxwell says he wanted to be freer to offer clients funds with better investment performance and lower fees.

> Jeff Davis says he was "young and wet behind the ears" when he was hired at Jones in 1993 after a stint as a White House intern. ***Even before he fully understood the financial incentives, he says he sold the seven funds almost exclusively.  "I was afraid not to,"***

19

he adds.  Mr. Davis, who left Jones in 2001 and started his own business, also says he was uncomfortable with the incentives and wanted more leeway to sell other funds.

[Emphasis added.]

52.     The revenue-sharing arrangements are harmful to investors, who, consistent with Edward Jones' representations, believe they are receiving objective, independent advice.  In this regard, the *Wall Street Journal* article quotes a disappointed Edward Jones client who invested in Putnam mutual funds as follows:

What [the client's] broker, Edward D. Jones & Co., never told her was that it had a strong incentive to sell Putnam funds instead of rivals that performed better.  Jones receives hefty payments -- one estimate tops $100 million a year -- from Putnam and six other fund companies in exchange for favoring those companies' funds at Jones's 8,131 U.S. sales offices, the largest brokerage network in the nation.

***When training its brokers in fund sales, Jones gives them information almost exclusively about the seven "preferred" fund companies, according to former Jones brokers***. Bonuses for brokers depend in part on selling the preferred funds, and Jones generally discourages contact between brokers and sales representatives from rival funds. ***But while revenue sharing and related incentives are familiar to industry insiders, Jones typically doesn't tell customers about any of these arrangements***.

***The situation "gives you the feeling of being violated," says Mrs. Wessels's son, DuWayne, a Waterloo, Iowa, real-estate broker***. He says he found out about the fund-company payments to Jones from his mother's new broker when the son moved her $300,000 account to another firm in 2002.

***"The deception is that the broker seems to give objective advice," says Tamar Frankel, a law professor at Boston University who specializes in mutual-fund regulation. "In fact, he is paid more for pushing only certain funds."***

[Emphasis added.]

53.     On January 14, 2004, *The Wall Street Journal* published an article under the headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers."  Citing "a person

familiar with the investigation," the article notes that the SEC is "close to filing its first charges against mutual fund companies related to arrangements that direct trading commissions to brokerage firms that favor those fund companies' products."  The article stated in pertinent part as follows:

> ***The SEC has been probing the business arrangements between fund companies and brokerage firms since last spring.***  It held a news conference yesterday to announce ***it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements***.
>
> Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing."  Agency officials said they expect that number to grow as its probe expands.  They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund.  [. . .]
>
> ***People familiar with the investigation say regulators are looking into examples of conflict of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs themselves out of the firm's own pockets.  The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements.  In other cases, the SEC is probing whether funds violated policies that would require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.***

*Id.* [Emphasis added.]

### The Prospectuses Were Materially False And Misleading

54.     Plaintiff and other members of the Class were entitled to, and did receive, one or more of the prospectuses (the "Prospectuses"), pursuant to which the Hartford Funds shares were offered, each of which contained substantially the same materially false and misleading statements and omissions regarding 12b-1 fees, commissions and Soft Dollars.

55.     As stated above, the Statement of Additional Information, referred to in certain of Hartford's prospectuses and available to the investor upon request, stated as follows with respect to Soft Dollars:

> General Distribution fees paid to HIFSCO may be spent on any activities or expenses primarily intended to result in the sale of the applicable Company's shares including: (a) payment of initial and ongoing commissions and other compensation payments to brokers, dealers, financial institutions or others who sell each Fund's shares, (b) compensation to employees of HIFSCO, (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of HIFSCO incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information, (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, i.e., advertisements and sales literature, and (e) other distribution-related expenses and for the provision of personal service and/or the maintenance of shareholder accounts. These plans are considered compensation type plans which means that the Funds pay HIFSCO the entire fee regardless of HIFSCO's expenditures.

56.     The Prospectuses failed to disclose and misrepresented, *inter alia,* the following material and damaging adverse facts which damaged Plaintiff and other members of the Class:

(a)     that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12b of the Investment Company Act, and unprotected by any "safe harbor";

(b)     that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds, which was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(c)     that the Hartford Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the

Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(d)     that by paying brokers to aggressively steer their clients to Hartford Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(e)     that any economies of scale achieved by marketing of the Hartford Funds to new investors were not passed on to Hartford Funds investors; on the contrary, as the Hartford Funds grew, fees charged to Hartford Funds investors continued to increase;

(f)     that defendants improperly used Soft Dollars and excessive commissions, paid from Hartford Funds assets, to pay for overhead expenses the cost of which should have been borne by Hartford and not Hartford Funds investors; and

(g)     that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that they failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Hartford Funds.

## COUNT I

**Against The Investment Adviser Defendants
For Violations Of Section 34(b) Of The Investment
Company Act On Behalf Of The Class**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Hartford Funds.

59.     The Investment Adviser Defendants made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  The Investment Adviser Defendants failed to disclose the following:

(a)     that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12b of the Investment Company Act, and unprotected by any "safe harbor";

(b)     that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds, which was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(c)     that the Hartford Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(d)     that by paying brokers to aggressively steer their clients to Hartford Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(e)     that any economies of scale achieved by marketing of the Hartford Funds to new investors were not passed on to Hartford Funds investors; on the contrary, as the Hartford Funds grew, fees charged to Hartford Funds investors continued to increase;

(f)     that defendants improperly used Soft Dollars and excessive commissions, paid from Hartford Funds assets, to pay for overhead expenses the cost of which should have been borne by Hartford and not Hartford Funds investors; and

(g)     that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Hartford Funds.

60.     By reason of the conduct described above, the Investment Adviser Defendants violated Section 34(b) of the Investment Company Act.

61.     As a direct, proximate and foreseeable result of the Investment Adviser Defendants' violation of Section 34(b) of the Investment Company Act, Hartford Funds investors have incurred damages.

62.     Plaintiff and the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by the shareholders, rather than by the Hartford Funds themselves.

63.     The Investment Adviser Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

**Against The Investment Adviser Defendants Pursuant
To Section 36(b) Of The Investment Company Act
Derivatively On Behalf Of The Hartford Funds**

64.     Plaintiff repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

65.     This Count is brought by the Class (as Hartford Funds securities holders) on behalf of the Hartford Funds against the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

66.     The Investment Adviser Defendants had a fiduciary duty to the Hartford Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser Defendants.

67.     The Investment Adviser Defendants violated Section 36(b) by improperly charging investors in the Hartford Funds purported Rule 12b-1 marketing fees, and by drawing on Hartford Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

68.     By reason of the conduct described above, the Investment Adviser Defendants violated Section 36(b) of the Investment Company Act.

69.     As a direct, proximate and foreseeable result of the Investment Adviser Defendants' breach of the fiduciary duty of loyalty in their role as investment advisers to Hartford Funds investors, Hartford Funds and the Class have incurred millions of dollars in damages.

70.     Plaintiff, in this count, seeks to recover the Rule 12b-1 fees, Soft Dollars, excessive commissions and the management fees charged the Hartford Funds by the Investment Adviser Defendants.

<u>**COUNT III**</u>

**Against Hartford Financial (As Control Person Of Hartford Funds and Hartford Funds II) And The Director Defendants (As Control Persons Of The Investment Adviser Defendants) For Violation Of Section 48(a) Of The Investment Company <u>Act By The Class And Derivatively On Behalf Of The Hartford Funds</u>**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     This Count is brought pursuant to Section 48(a) of the Investment Company Act against Hartford Financial, as control person of Hartford Funds and Hartford Funds II, and the Director Defendants as Control Persons of the Investment Adviser Defendants who caused the Investment Adviser Defendants to commit the violations of the Investment Company Act alleged herein.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein are the collective actions of Hartford Financial and the Director Defendants.

73.     The Investment Adviser Defendants are liable under Sections 34(b) of the Investment Company Act to the Class and under 36(b) of the Investment Company Act to the Hartford Funds as set forth herein.

74.     Hartford Financial and the Director Defendants were "control persons" of the Investment Adviser Defendants and caused the violations complained of herein.  By virtue of their positions of operational control and/or authority over the Investment Adviser Defendants, Hartford Financial and the Director Defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Investment Adviser Defendants to engage in the wrongful conduct complained of herein.

75.     Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Hartford Financial and the Director Defendants are liable to Plaintiff to the same

extent as are the Investment Adviser Defendants for their primary violations of Sections 34(b) and 36(b) of the Investment Company Act.

76.     By virtue of the foregoing, Plaintiff and other Class members are entitled to damages against Hartford Financial and the Director Defendants.

## COUNT IV

### Against The Investment Adviser Defendants Under Section 215 Of The Investment Advisers Act For Violations Of Section 206 Of The Investment Advisers Act Derivatively On Behalf Of The Hartford Funds

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

79.     The Investment Adviser Defendants served as "investment advisers" to the Hartford Funds and other members of the Class pursuant to the Investment Advisers Act.

80.     As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Hartford Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

81.     During the Class Period, the Investment Adviser Defendants breached their fiduciary duties to the Hartford Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Hartford Funds.  As detailed above, the Investment Adviser Defendants skimmed money from the Hartford Funds by charging and collecting fees from the Hartford Funds in violation of the Investment Company Act and the Investment Advisers Act.  The purpose and effect of said

scheme, practice and course of conduct was to enrich the Investment Adviser Defendants, among other defendants, at the expense of the Hartford Funds.  The Investment Adviser Defendants breached their fiduciary duties owed to the Hartford Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon the Hartford Funds.

82.     The Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein.  The Investment Adviser Defendants, because of their position of authority and control over the Hartford Funds were able to and did control the fees charged to and collected from the Hartford Funds and otherwise control the operations of the Hartford Funds.

83.     The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Hartford Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Hartford Funds.  The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Hartford Funds from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including:  (1) the charging of the Hartford Funds and Hartford Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Hartford Funds for excessive and improper commission payments to brokers.

84.     As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Hartford Funds, the Hartford Funds were damaged.

85.      The Hartford Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## COUNT V

### Breach Of Fiduciary Duty Against
### The Investment Adviser Defendants On Behalf Of The Class

86.     Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

87.     As advisers to the Hartford Funds the Investment Adviser Defendants were fiduciaries to the Plaintiff and other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

88.     As set forth above, the Investment Adviser Defendants breached their fiduciary duties to Plaintiff and the Class.

89.     Plaintiff and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

90.     Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT VI

### Breach Of Fiduciary Duty Against The Director
### Defendants On Behalf Of The Class

91.     Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

92.     As Hartford Funds Directors, the Director Defendants had a fiduciary duty to the Hartford Funds and Hartford Funds investors to supervise and monitor the Investment Adviser Defendants.

93.     The Director Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging the Hartford Funds and Hartford Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Hartford Funds for excessive and improper commission payments to brokers.

94.     Plaintiff and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

95.     Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT VII

### Aiding And Abetting A Breach Of Fiduciary Duty Against The Investment Adviser Defendants On Behalf Of The Class

96.     Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

97.     At all times herein, the broker dealers that sold Hartford Funds had fiduciary duties of loyalty to their clients, including Plaintiff and other members of the Class.

98.     The Investment Adviser Defendants knew or should have known that the broker dealers had these fiduciary duties.

99.     By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions in exchange for aggressively pushing Hartford Funds, and by failing to disclose the receipt of

such fees, the brokerages breached their fiduciary duties to Plaintiff and the other members of the Class.

100.    The Investment Adviser Defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless perpetrated the fraudulent scheme alleged herein.

101.    The Investment Adviser Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiff and the other members of the class. By participating in the brokerages' breaches of fiduciary duties, the Investment Adviser Defendants are liable therefor.

102.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' knowing participation in the brokerages' breaches of fiduciary duties, Plaintiff and the Class have suffered damages.

103.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class Counsel as pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding punitive damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding the Hartford Funds rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

E.      Ordering an accounting of all Hartford Fund-related fees, commissions, and Soft Dollar payments;

F.      Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

G.      Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that Plaintiff and the Class have an effective remedy;

H.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

I.      Such other and further relief as the Court may deem just and proper.

33

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

By_____
J. Daniel Sagarin  CT 04289
David A. Slossberg CT 13116
**HURWITZ & SAGARIN, LLC**
147 North Broad Street
P.O. Box 112
Milford, CT 06460
(203) 877-8000

Steven G. Schulman
Janine L. Pollack
Kim E. Levy
Peter E. Seidman
**MILBERG WEISS BERSHAD**
 **HYNES & LERACH LLP**
One Pennsylvania Plaza
New York, NY  10119-0165
(212) 594-5300

**Counsel for Plaintiff and the Class**