# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

———————————————————————x
IN RE HARTFORD MUTUAL FUNDS FEE    :    MASTER FILE: 3:04CV00344 (AWT)
LITIGATION    :
    :    Dated:  December 20, 2004
**THIS DOCUMENT RELATES TO: ALL**    :
**ACTIONS**    :
    :
    :
———————————————————————x

## WELLINGTON MANAGEMENT COMPANY, LLP'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Ira K. Gross (ct-03747)
William T. Matlack (ct-26079)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
Telephone: (617) 338-2800
Facsimile: (617) 338-2880
Email: igross@sandw.com
wmatlack@sandw.com


Francis J. Brady (ct-04296)
Marilyn B. Fagelson (ct-17202)
MURTHA CULLINA LLP
CityPlace I-185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
Email:  fbrady@murthalaw.com
mfagelson@murthalaw.com

# TABLE OF CONTENTS

INTRODUCTION                                                                    1

BACKGROUND                                                                      3

ARGUMENT                                                                        6

I.      STANDARD FOR MOTION TO DISMISS ..........................................................6

II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COUNTS
        BROUGHT DIRECTLY AS CLASS ACTION CLAIMS CAN ONLY BE
        BROUGHT DERIVATIVELY ON BEHALF OF THE FUNDS AND
        PLAINTIFFS HAVE FAILED TO MEET THE REQUIREMENTS OF RULE
        23.1.............................................................................................................................8

        A.     The Claims Brought By Plaintiffs Are Derivative Because They Allege
               Harm to the Funds, Not to Individual Shareholders. ..................................8

        B.     Plaintiffs Have Failed to Meet the Requirements of Rule 23.1 For Their
               Derivative Claim Against Wellington. ......................................................10

III.    PLAINTIFFS HAVE FAILED TO ALLEGE FACTS THAT WOULD
        IMPLICATE WELLINGTON IN THE CONDUCT ON WHICH ALL OF
        THEIR CLAIMS ARE BASED...........................................................................12

        A.     Plaintiffs' Allegations of Control by Wellington Over the Funds and Their
               Directors Are Ungrounded and Unsupportable. ........................................12

        B.     Plaintiffs Fail to Link Wellington to Any Allegedly Wrongful Conduct,
               and Wellington's Performance Under the Sub-Advisory Contracts was
               Entirely Lawful. ......................................................................................14

               1.     Wellington Neither Received Nor Spent Any 12b-1 Marketing
                      Fees. ..........................................................................................14

               2.     Directed Brokerage Performed By Wellington Was Fully
                      Disclosed and Permissible Under Applicable SEC Regulations. ..15

               3.     Plaintiffs' "Soft Dollar" Allegations Fail to State a Claim Against
                      Wellington..................................................................................17

        C.     Plaintiffs' Claims Based On Alleged Failures To Disclose Information To
               The Funds' Shareholders Fail To State Any Claim Against Wellington
               Because Wellington Has No Such Disclosure Obligation As An
               Independent Sub-Adviser To The Funds. ..................................................19

i

IV.     ALL COUNTS OF THE COMPLAINT ARE LEGALLY DEFICIENT AND
        SUBJECT TO DISMISSAL FOR INDEPENDENT REASONS .........................19

        A.     Count I Fails to State a Claim Against Wellington Because It Is Based on
               Disclosure Obligations That Do Not Implicate Wellington. .....................20

        B.     Count III Fails to State a Section 36(b) Claim Against Wellington. .........20

               1.     Plaintiffs Make No Allegation Regarding Any Violation of § 36(b)
                      With Regard to Wellington's Sub-Advisory Fees. ........................21

               2.     Plaintiffs' Allegations Regarding Payments to Brokers Do Not
                      State a Section 36(b) Claim Against Wellington. ..........................24

        C.     Count V Fails to State a Claim Against Wellington Because Plaintiffs
               Have Not Pled Fraud Against Wellington. .................................................26

        **CONCLUSION**                                                                28

{B0356260; 6}

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re American Express Co. Shareholder Litigation, 39 F.3d 395 (2d Cir. 1994)...............7, 13, 19

Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704 (2d Cir. 2002)......................................6

Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42 (2d Cir. 1991).........................1, 2

DM Research v. Coll. of Am. Pathologists, 170 F.3d 53 (1st Cir. 1999).......................7

Delmarva Sash & Door Co.  of Md. v. Andersen Windows, Inc.,
        218 F. Supp. 2d 729 (D. Md. 2002).........................................................8, 10

Dorchester Investors v. Peak Int. Ltd., 134 F. Supp. 2d 569 (S.D.N.Y. 2001)..............20

Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982).......22, 23

Green v. Nuveen Advisory Corp., 295 F.3d 738 (7th Cir. 2002) ................................25

Halligan v. Standard & Poor's/Intercapital, Inc., 434 F. Supp. 1082 (E.D.N.Y. 1977)................25

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085 (2d Cir. 1995) ....................................7

Kamen v. Kemper Finance Servs., Inc., 500 U.S. 90 (1991).....................................8, 11

Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140 (3d Cir. 2002)............7, 23

LaBounty v. Adler, 933 F.2d 121 (2d Cir. 1991) ............................................................6

In re Merrill Lynch & Co. Research Reports Secs. Litig.,
        272 F. Supp. 2d 243 (S.D.N.Y. 2003)....................................................9, 20

In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56 (2d Cir. 1998) ...............................1

Migdal v. Rowe Price-Fleming Int'l Inc., 248 F.3d 321 (4th Cir. 2001)............7, 23, 24

In re Nuveen Fund Litigation,
        No. 94 C 360, 1996 WL 328006, at *10 (N.D. Ill. June 11, 1996)........21, 25

Olmstead v. Pruco Life Ins. Co., 283 F.3d 429 (2d Cir. 2002)....................................20

Ortiz v. Cornetta, 867 F.2d 146 (2d Cir. 1989)..............................................................6

Polera v. Altorfer, Podesta, Woolard & Co., 503 F. Supp. 116 (N.D. Ill. 1980)..........27

{B0356260; 6}

Rohrbaugh v. Inv. Co. Inst.,
    No. Civ. A. 00-1237, 2002 WL 31100821, at *6 (D.D.C. Jul. 2, 2002) ......................9

San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996)........................................................................................1

Sazerac Co. v. Falk, 861 F. Supp. 253 (S.D.N.Y. 1994) ...............................................2, 15

Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002) ....................................................8, 9, 10

Wolff v. City of N.Y. Fin. Services, 939 F. Supp. 258 (S.D.N.Y. 1996) .......................6

## STATE CASES

Danielewicz v. Arnold, 769 A.2d 274 (Md. Ct. Spec. App. 2001)............................9, 11

Sekuk Global Sharing Enters. Profit Sharing Plan v. Kevenides,
    No. 24-C-03-007496, 007876, 008010, 2004 WL 1982508
    (Md. Cir. Ct. May 25, 2004) ..................................................................................11

Waller v. Waller, 49 A.2d 449 (Md. 1946)...................................................................9

Werbowsky v. Collomb, 766 A.2d 123 (Md. Ct. Spec. App. 2001)............................11

## FEDERAL STATUTES

15 U.S.C. § 78bb(e) ....................................................................................17, 18

Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq ........................................5

15 U.S.C. § 80a-2(a)(9)...............................................................................13

15 U.S.C. § 80a-33(b) ................................................................................20

15 U.S.C. § 80a-35(b) ..............................................................21, 22, 23, 24, 25

Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq .........................................5

Investment Company Amendments Act of 1970,
    S. Rep. No. 91-184, 91st Cong., 2d Sess. (1970) ] ....................................22

# FEDERAL RULES

Fed. R. Civ. P. 8 ..................................................................................................................27

Fed. R. Civ. P. 8(a) .............................................................................................................1

Fed. R. Civ. P. 9(b) ........................................................................................................1, 27

Fed. R. Civ. P. 12(b)(6) ..................................................................................................1, 27

Fed. R. Civ. P. 23.1 ...........................................................................................1, 8, 10, 11, 12

Order Approving Proposed Rule Change and Related Interpretation Under Section 36 of
    the NASD, Release Nos. 17599, 11662, 46 Fed. Reg. 16102 (Mar. 10, 1981) ..... 16-17

Prohibition on the Use of Brokerage Commissions to Finance Distribution, 69 Fed. Reg.
    54728 (Sep. 9, 2004) (Final Rule) .............................................................................16

Registration Form Used By Open-End Management Inv. Co., Release No. IC-23064,
    Fed. Reg. 13916-01, 1998 WL 107729 at 25 (Mar. 13, 1998) ...................................17

# MISCELLANEOUS

5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357
    (2d ed. 1990) ................................................................................................................7

Defendant Wellington Management Company, LLP, ("Wellington") submits this memorandum in support of its Motion to Dismiss the Consolidated Amended Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 8(a), 9(b), 12(b)(6) and 23.1.[1]

## INTRODUCTION

Wellington does not belong in this case. At the very outset of the Complaint, plaintiffs describe the alleged conduct on which their claims are based as follows:

> The Hartford Financial Services Group, Inc. . . . . and those of its subsidiaries and affiliates also named herein as defendants, charg[ed] Hartford mutual fund investors excessive fees and expenses that they then used, in part, to improperly pay and induce brokers to steer more investors into Hartford mutual funds.

Complaint, ¶ 1. Neither this summary, nor the extensive elaboration that follows in the ensuing 176 paragraphs of the Complaint, implicates Wellington in any way that justifies its inclusion as a defendant.

Wellington is not within plaintiffs' description of the parties allegedly involved in the conduct that plaintiffs assert is actionable. In fact, Wellington is a wholly independent investment advisory firm, not a subsidiary or affiliate of The Hartford Financial Service Group, Inc. ("Hartford"), and the Complaint makes no allegation to the contrary.[2]

---

[1] Wellington also incorporates by reference, and will not repeat here, all relevant arguments for dismissal advanced by its co-defendants in their motions to dismiss and supporting papers.

[2] This memorandum makes reference to the March 1, 2003 Prospectus and Statement of Additional Information ("SAI") for certain of the Funds involved. These documents are included with the materials submitted by the Hartford defendants. The Complaint refers to and cites these disclosure documents, and they are integral to the Complaint. They are therefore properly before the Court in deciding a 12(b)(6) motion. See In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998) (prospectuses and annual reports may be considered by the Court on Rule 12(b)(6) motion because they are filed with the SEC and were cited by and integral to the complaint); citing San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996) (full text of documents partially quoted in the complaint, but integral to it, may be considered by the court in deciding motion to dismiss). The consideration of these documents is not inclusion of extrinsic material that would convert a 12(b)(6) motion to dismiss into a motion for summary judgment under Rule 56. See Cortec

{B0356260; 6}

A critical threshold implication of Wellington's independence is that the plaintiffs cannot possibly establish, as they must because their claims are derivative in nature, that a demand on the directors of the Hartford Funds would be futile with respect to Wellington.  No demand has been made, and especially in view of Wellington's status as an independent sub-adviser, the lack of demand cannot be excused.  With one exception,[3] therefore, each of the claimed direct class action counts fails to state any claim upon which relief can be granted.

Even if the plaintiffs could establish the futility of demand, the Complaint does not allege participation by Wellington in the "scheme" on which plaintiffs' claims are premised—hidden arrangements for the purchase of "shelf space" for Hartford funds at brokerage houses in exchange for "kickbacks" made improperly from fund assets.  See Complaint, ¶¶ 45-61.  In fact, Wellington's role with regard to Hartford mutual funds is confined to providing portfolio management and related services, which do not include distribution or sponsorship of the funds.[4] Again, the Complaint makes no allegation to the contrary.  Because their claims against Wellington cannot survive a direct confrontation with these undeniable facts, plaintiffs have resorted to a "group pleading" strategy designed to obscure them.

Rather than dealing specifically with Wellington, the Complaint improperly includes Wellington in the group definition of "Investment Adviser Defendants" with two wholly- or

---

Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47-48 (2d Cir. 1991) (public disclosure filings are essentially adopted by reference into complaint alleging securities fraud and do not convert Rule 12 motion into summary judgment).

[3] The exception is Count III, which pleads allegations regarding § 36(b) of the Investment Company Act.  Count III is subject to dismissal on other grounds.  See infra at section IV.

[4] Wellington provides such services, pursuant to arms'-length contracts, as a sub-adviser to Hartford Investment Financial Services, Inc. ("HIFSCO"), the funds' investment manager.  Plaintiffs reference Wellington's contracts in the Complaint at ¶ 148, and the Court may therefore consider these documents as well in ruling on Wellington's motion to dismiss.  See Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) and authority cited supra at fn. 2.

majority-owned subsidiaries of the Hartford, HIFSCO and Hartford Investment Management Company ("HIMCO"), and then makes undifferentiated and conclusory allegations against the group. This deceptive pleading device is insufficient as a means of stating a claim against Wellington. Because the entire Complaint rests upon this impermissibly overbroad definition, and the purported allegations insofar as they purport to apply to *Wellington* are simply conclusory claims without any specific factual support, the entire Complaint should be dismissed against Wellington.

Furthermore, each of the counts against Wellington fails as a matter of law for independent reasons. These reasons include many that also apply to the Hartford defendants, and Wellington expressly incorporates by reference the relevant arguments for dismissal contained in their motion papers. There are also a number of count-specific arguments for dismissal particular to Wellington; these relate directly to the fundamental failure of plaintiffs to allege necessary predicate facts *against Wellington*, and are spelled out in section IV, *infra*.

## BACKGROUND

### The Parties and their Roles

The Complaint arises in connection with plaintiffs' alleged ownership of shares of certain mutual funds that are part of two groups of funds known as The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (collectively, the "Funds"). Plaintiffs claim to be holders of such shares during the period from January 30, 1999 to November 17, 2003. The Funds consist of a series of open-ended management investment companies organized as Maryland corporations. See SAI at p. 1.

Defendant HIFSCO is the manager and principal underwriter of each Fund. See id. HIFSCO oversees all the administrative functions of the Funds, including providing personnel, services, equipment and facilities used in their operation. See id. HIFSCO is also solely

3

responsible for the distribution and sponsorship of the Funds, as the Funds' disclosures make clear.  Id. at p. 87.  All 12b-1 fees and marketing expenses are paid by HIFSCO, either from the Funds' assets or from HIFSCO's own assets.  Id.  HIFSCO is an indirect majority-owned subsidiary of the Hartford.  Id. at p. 1.

By contrast, Wellington is an independent investment sub-adviser to certain of the Funds pursuant to two arm's-length contracts with HIFSCO.  See Investment Sub-Advisory Agreement, dated February 19, 2002 and Investment Sub-Advisory Agreement, dated March 3, 1997 and as amended (collectively, the "ISAs"), attached as Exhibits A and B.[5]  Pursuant to these contracts, Wellington is responsible for the day-to-day investment of the assets of certain of the Funds, and for furnishing these Funds with information and advice about those investments.  ISA ¶ 4, SAI at p. 84.  Wellington also votes proxies for the Funds whose assets it manages.  In exchange for these investment services, Wellington is paid a sub-advisory fee calculated as a percentage of the Funds' assets under management.  ISA at ¶ 7.  This sub-advisory fee includes "break points," meaning that as the size of the assets under management increases the sub-advisory fee as a percentage of assets under management paid to Wellington decreases.  Id.  As an independent investment sub-adviser, Wellington has no involvement in the administration, distribution or sponsorship of the Funds.  SAI at p. 84-87.  Those functions are performed by HIFSCO.  Id.

HIMCO is also an investment sub-adviser to the Funds, responsible for the investments of the assets of certain Funds not sub-advised by Wellington.  Unlike Wellington, however, HIMCO is a wholly-owned subsidiary of the Hartford.  Id. at p. 1.

---

[5] Wellington's contracts were previously submitted as exhibits to the affidavit of John E. Bruno. Wellington attaches them here for the Court's convenience.

<u>The Complaint's Mischaracterization of Wellington</u>

The Fund administration, management and sale functions performed by HIFSCO and the Hartford related entities on the one hand, and the circumscribed independent investment sub-advisory services provided by Wellington on the other hand, are clearly explained in the annual prospectuses and SAIs issued by the Funds (and referenced by the plaintiffs). Nonetheless, in framing the Complaint, the plaintiffs improperly cast Wellington as an "Investment Adviser Defendant" functionally identical to the fund manager and majority-owned Hartford entity HIFSCO, as well as the Hartford subsidiary HIMCO. Plaintiffs' theory of liability is that "Defendants," including Wellington as one of the "Investment Adviser Defendants," and various broker-dealers devised a scheme through which the "Defendants" paid the brokers to sell Fund shares pursuant to a "shelf-space" arrangement. Complaint ¶ 46. This arrangement allegedly consisted of agreements between the "Investment Adviser Defendants" and brokers to share revenue with the brokers, direct brokerage primarily to brokers who sold Fund shares, and pay "excessive" commissions for the Funds' investment transactions, all allegedly in return for the broker's services in promoting the sale of Fund shares. Complaint ¶ 47. Plaintiffs further allege that the "Defendants" conspired to and did conceal this allegedly wrongful behavior from Fund shareholders. Complaint ¶ 61.

<u>The Complaint's Claims Against Wellington</u>

The Complaint includes ten counts; Wellington is named as a defendant in eight of those counts (Counts I, II, III, V, VI, VII, IX and X). Counts I, II and III are brought under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq*. (the "ICA"); Count V is brought under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*. (the "IAA"); Count VI is

5

brought under the Connecticut Unfair Trade Practice Act ("CUTPA"); and Counts VII, IX and X are brought under the common law.  All of the claims asserted against Wellington are based solely upon participation in the allegedly improper "shelf-space programs" or their purported concealment.

All of the Complaint's counts against Wellington are fatally deficient for a number of reasons, but most glaringly because plaintiffs ignore Wellington's actual role as an independent investment sub-adviser neither owned by nor affiliated with the Hartford entities.  This defect undermines any argument of demand futility plaintiffs might make as to their derivative claims against Wellington, and, together with plaintiffs' failure to make any specific allegations concerning any involvement by Wellington in the "shelf-space programs," infects each of plaintiffs' overbroad allegations of wrongdoing.


## ARGUMENT

### I.    STANDARD FOR MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) should be granted where the plaintiff cannot prove any set of facts in support of its claim that would entitle it to relief.  See, e.g., Wolff v. City of N.Y. Fin. Servs., 939 F. Supp. 258, 263 (S.D.N.Y. 1996).  In considering such a motion, the court must accept the factual allegations of the complaint as true, and afford the plaintiff reasonable inferences that can be drawn from those factual allegations.  See LaBounty v. Adler, 933 F. 2d 121, 123 (2d Cir. 1991); citing Ortiz v. Cornetta, 867 F.2d 146, 149 (2d Cir. 1989).

Although a plaintiff's factual allegations must be taken as true for the purpose of deciding a motion to dismiss, the Court should give "no credence to plaintiff's conclusory allegations" about the legal status of the opposing party.  Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) (dismissal affirmed where plaintiffs failed to plead required diligence) (internal

{B0356260; 6}

quotation and citation omitted).  "Rule 12(b)(6) . . . is not without meaning.  The presence [ ] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion."  Migdal v. Rowe Price-Fleming Int'l Inc., 248 F.3d 321, 326 (4th Cir. 2001) (internal quotation omitted).  Simply asserting the liability of the defendant for particular acts is not sufficient, and such conclusory allegations are not accepted as true for the purpose of deciding a 12(b)(6) motion.  See, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1096 (2d Cir. 1995) (fundamental deficiencies in plaintiff's assertions justified dismissal of the complaint); In re Am. Express Co. Shareholder Litig., 39 F.3d 395, 400-01 n.3 (2d Cir. 1994) (cursory assertions of liability not sufficient where based only on conclusory allegations about legal status of defendants' acts).

Plaintiffs here are not entitled to the presumption of truth with respect to vague group pleading allegations against the "Investment Adviser Defendants" that fail to allege any specific facts against Wellington.  "[A]lthough the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant."  Migdal, 248 F.3d at 326; quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 318 (2d ed. 1990).  See also Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140, 143-44 (3d Cir. 2002) (same).  As stated by the Migdal court, conclusory allegations in a complaint, standing alone, "are a danger sign that the plaintiff is engaged in a fishing expedition."  Migdal, 248 F.3d at 326; quoting DM Research v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999).  Rule 12(b)(6) requires more than such conclusory allegations combined with a mere recitation of boilerplate statutory language.  Id. at 328.  Because plaintiffs fail to plead any specific facts that state a claim against Wellington, the Complaint fails to meet this standard and should be dismissed.

II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COUNTS BROUGHT
        DIRECTLY AS CLASS ACTION CLAIMS CAN ONLY BE BROUGHT
        DERIVATIVELY ON BEHALF OF THE FUNDS AND PLAINTIFFS HAVE FAILED
        TO MEET THE REQUIREMENTS OF RULE 23.1

        Plaintiffs mischaracterize all of their claims but one as direct.  Plaintiffs lack standing to

bring their claims in this manner because each of the claims (except Count III)[6] is in fact a

derivative claim that can only be brought on behalf of the relevant Hartford mutual fund

company after proper demand on its directors.  Although Count V is pled as a derivative claim,

it, too, must be dismissed because no demand has been made, and plaintiffs have not pled and

cannot plead facts to satisfy the burden of demonstrating that demand may be excused with

respect to claims against Wellington as an independent sub-adviser.

        A.      The Claims Brought By Plaintiffs Are Derivative Because They Allege Harm to
                the Funds, Not to Individual Shareholders.

        Because the Funds are organized as Maryland corporations, Maryland law governs how

claims relating to corporate management must be brought.  Kamen v. Kemper Fin. Servs., Inc.,

500 U.S. 90, 98 (1991) (Investment Company Act and Investment Advisers Act defer to state

law on the allocation of power within a corporation, and the power to bring suit).  The threshold

question is whether the alleged injury is, in the first instance, to the corporation's "business or

property" or is a "distinct injury" to the shareholders.  The former must be brought derivatively

and only the latter permits a direct claim by the injured shareholder.  Delmarva Sash & Door Co.

of Md. v. Andersen Windows, Inc., 218 F. Supp. 2d 729, 734 (D. Md. 2002); citing Strougo v.

Bassini, 282 F.3d 162, 174-75 (2d Cir. 2002).  Claims of corporate waste leading to a diminution

---

        [6] Count III of the Complaint is subject to dismissal for different reasons, as discussed in section
IV, *infra*.

of the corporation's value, such as the allegations of wrongful expenditures of corporate assets, are not distinct damages to the shareholder even if they cause the value of his shares to decline. Such claims can only be brought derivatively on behalf of the corporation.  See Danielewicz v. Arnold, 769 A.2d 274, 283 (Md. Ct. Spec. App. 2001); quoting Waller v. Waller, 49 A.2d 449, 452 (Md. 1946) (affirming dismissal of complaint for mismanagement and waste that shareholder sought to bring directly).

Under Maryland law, claims that a mutual fund company has paid improper underwriting, advisory or transactional costs can therefore only be recovered by the fund itself, or through a derivative suit on its behalf.  See Strougo, 282 F.3d at 174 (claims regarding improper mutual fund advisory fees and transaction costs could not be brought directly by mutual fund shareholder because such injuries were in the first instance to the corporation and shareholders suffered no injury distinct from the alleged injury to the corporation).  Similarly, allegations that other fees paid by a mutual fund company violated the ICA because they benefited the funds' advisors and not the funds do not state a direct shareholder claim because the shareholders have not suffered a distinct injury.  Rohrbaugh v. Inv. Co. Inst., No. Civ. A. 00-1237 2002 WL 31100821, at *6-7 (D.D.C. Jul. 2, 2002).  See also  In re Merrill Lynch & Co. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 260 (S.D.N.Y. 2003) (dismissing ICA claim because "plaintiff's supposed injuries, and those of the purported class, are not distinct from those of the Fund; rather, they are alleged to arise because the Fund's net asset value declined.") (collecting cases).

The claims pled in the Complaint are clearly derivative.  Plaintiffs accuse the defendants of wasting corporate assets through purported marketing schemes involving payments to brokers that plaintiffs allege did not benefit the Funds.  See, e.g., Complaint ¶¶ 119(e), 134, 150-51, 155,

9

160, 173, 177.  Such payments were allegedly made with Fund assets and any injury stemming

from them would therefore be "corporate property" that could only be the subject of a claim by

the Funds.  See <u>Delmarva Sash & Door</u>, 218 F. Supp. 2d at 734; <u>Strougo</u>, 282 F.3d at 174-75.[7]

B.    <u>Plaintiffs Have Failed to Meet the Requirements of Rule 23.1 For Their
      Derivative Claim Against Wellington</u>.

Plaintiffs have pled Count V as a derivative claim.  Under Rule 23.1 of the Federal Rules

of Civil Procedure, they must allege either that they have made demand on the Funds' Boards of

Directors, or that such demand would be futile.  Plaintiffs claim that demand would be futile.

Complaint ¶ 89.  This allegation of futility is insufficient as a matter of law as applied to the

Count V claims made against all defendants, but it is particularly untenable with respect to

Wellington.

---

[7] Plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Request for a Stay of Discovery ("Stay Opposition") that their claims are properly direct because, they say, "the injury of excessive fees is incurred directly by the mutual fund investor."  Stay Opposition, p.10 fn 6.  They erroneously claim that this argument finds support in a Fund Prospectus that is referred to in the Complaint.  Indeed, plaintiffs flatly allege:

These "shelf-space" arrangements also resulted in inflated fees charged to investors.  As stated in the March 1, 2003, Hartford Advisers Fund prospectus, which is identical in substance to all prospectuses issued during the Class Period, *these fees, which include management and 12b-1 fees, are 'paid directly from your [the shareholders'] investment.*'  These fees were assessed directly against shareholders and immediately affected the current redemption value of their shares.

Complaint ¶ 48 (internal quotation and bracket in original) (emphasis added).

The Prospectus, however, says nothing of the kind.  See Hartford Mutual Funds Prospectus p. 5.  It does list certain fees in table form under the heading "Shareholder Fees (fees paid directly from your investment)."  Id.  This is the phrase plaintiffs quote, but these shareholder fees are comprised of nothing more than transactional sales, load and exchange fees.  Id.  By contrast, the next table lists "Management fees" and "Distribution and service (12b-1) fees" under the heading "Annual operating expenses (expenses that are <u>deducted from the fund's assets</u>)" (emphasis added).  The Funds' Prospectuses, therefore, directly contradict the plaintiffs' argument that the allegedly improper fees were "incurred directly by the mutual fund investor."  (Stay Opposition, p.10 fn 6).

{B0356260; 6}

In actions under the ICA and IAA, although the specifics of pleading demand are defined by Rule 23.1, the contours of the demand requirement itself are governed by the law of the state where the Fund is incorporated.  <u>Kamen</u>, 500 U.S. at 108-09 ("a court that is entertaining a derivative action under [the Investment Company Act] must apply the demand futility exception as it is defined by the law of the State of incorporation").  Maryland law makes clear that demand on a corporation's directors "will not be excused lightly."  <u>Sekuk Global Sharing Enters. Profit Sharing Plan v. Kevenides</u>, No. 24-C-03-007496, 007876, 008010, 2004 WL 1982508, at *4 (Md. Cir. Ct. May 25, 2004) (action dismissed because derivative suit could be brought only after "intra-corporate" remedies, i.e. demand, were pursued); <u>citing</u> <u>Werbowsky v. Collomb</u>, 766 A.2d 123, 143 (Md. Ct. Spec. App. 2001).

Maryland courts regard the excuse of futility as "a very limited exception, to be applied only when the allegations or evidence *clearly demonstrate*, *in a very particular manner*" either that delaying the suit to make demand would present an unacceptable risk to the corporation's interest, or that a majority of the directors are "so personally and directly conflicted" that they cannot be expected to exercise their good faith business judgment.  <u>Danielewicz</u>, 769 A.2d at 291 (emphasis added); <u>quoting</u> <u>Werbowsky</u>, 766 A.2d at 144.  Indeed, where there is only a simple allegation of self-interest by the Board, some specific connection to the Board's inability to reach an independent decision must be pled in order to state a claim that the demand is futile.  <u>Sekuk</u>, 2004 WL 1982508, at *4-5.

The Complaint pleads no facts that could meet this standard with regard to plaintiffs' claims *against Wellington*.[8]  In fact, plaintiffs plead nothing at all on the subject of the alleged

---

[8] The other defendants' papers explain in detail why plaintiffs have not met the narrow demand futility requirement as to those defendants.  Wellington incorporates these arguments by reference here.

futility of a demand that the relevant Fund Boards address *Wellington's* supposed wrongdoing. Rather, plaintiffs assert that the Director Defendants were unable to make independent decisions as to the alleged wrongful conduct by the "Investment Adviser Defendants" because, they claim, the "Investment Adviser Defendants" "controlled" the Directors.  Complaint ¶ 90.  As discussed in more detail *infra* in section III, however, these "control" allegations are entirely groundless, at least with respect to Wellington.  As an independent investment sub-adviser, Wellington had no ability to control the Boards of the relevant Funds, and the Complaint makes no allegation to the contrary *regarding Wellington*.  Plaintiffs' failure to make demand upon the relevant Fund Boards is, therefore, not excused, and their Count V derivative claim against Wellington should be dismissed.  Fed. R. Civ. P. 23.1.

III.   PLAINTIFFS HAVE FAILED TO ALLEGE FACTS THAT WOULD IMPLICATE
       WELLINGTON IN THE CONDUCT ON WHICH ALL OF THEIR CLAIMS ARE
       BASED

The Complaint includes no specific allegations that Wellington was engaged in the allegedly wrongful "shelf-space programs" or participated in concealing them.  The plaintiffs rely instead on a "guilt by affiliation" approach.  They include Wellington, without justification or explanation, in the group pleading allegations against the "Investment Adviser Defendants." They compound their error and underscore the fecklessness of their position by using this device to make the remarkable assertion that Wellington, an independent sub-adviser, had control over the Funds and their Boards of Directors.

       A.   Plaintiffs' Allegations of Control by Wellington Over the Funds and Their
            Directors Are Ungrounded and Unsupportable.

A basic premise of the Complaint is that the so-called "Investment Adviser Defendants" asserted control over the individual directors of the Funds, and in so doing caused those directors to fail properly to supervise the Funds' activities and expenditures, see, e.g., Complaint ¶¶ 42,

{B0356260; 6}

68, 90, thereby facilitating, a "scheme" through which broker-dealers would trade "shelf space" for various kinds of "improper" payments.

The Complaint alleges that "each of the Director Defendants was appointed by, and serves at the pleasure of, the Investment Adviser Defendants" and that "[e]ach of the Director Defendants is controlled by and beholden to the Investment Adviser Defendants for his or her positions and substantial compensation as Directors." Id.

"Control" is defined in the ICA as "power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." 15 U.S.C. § 80a-2(a)(9).  Plaintiffs do not plead a single fact to support the conclusion that Wellington held such power with respect to the Funds.  To the contrary, the available and undisputed facts are that Wellington's independent investment management duties in connection with the Funds are fully defined in and circumscribed by its arm's-length contracts with HIFSCO.  SAI at pp. 84-87.  Pursuant to these contracts, Wellington plays *no role whatsoever* in the distribution or sponsorship of the Funds, and has no ability to influence the selection of Directors of the Funds.  ISA ¶¶ 1-5.[9]  Plaintiffs cannot avoid those facts by using unsupported conclusory allegations in an attempt to state a claim.  See In re Am. Express Co. Shareholder Litig., 39 F.3d at 400-01 n.3.

---

[9] The example provided by plaintiffs to support their overbroad claims further demonstrates this point.  Plaintiffs assert that the individual who is the Chairman of the Hartford and President of HIFSCO is also a director or officer of 75 Hartford Funds.  Complaint ¶ 68.  Whether or not this alleged example of overlap in officers and directors between the Hartford entities and the Funds has any significance at all, it is obviously irrelevant to any contention that Wellington controlled the Directors of the Funds.

{B0356260; 6}

B.      <u>Plaintiffs Fail to Link Wellington to Any Allegedly Wrongful Conduct, and
Wellington's Performance Under the Sub-Advisory Contracts was Entirely
Lawful</u>.

Stripped of the unsupported and unsupportable allegations that Wellington bears liability

as the result of its "affiliation" with Hartford or its "control" over the Directors and the Funds,

the Complaint fails to make any specific allegations against Wellington that could conceivably

render it responsible for the allegedly improper "shelf space" arrangements.  The Complaint

alleges four categories of purported misconduct by the "Investment Adviser Defendants":  1)

improper use of 12b-1 marketing fees (Complaint ¶ 73);  2) "directed brokerage," by which

certain of the Funds' securities trades were directed to the broker-dealers in question (Complaint

¶ 106(c));  3)"Soft Dollar" payments to the broker-dealers, representing payments in addition to

the actual execution costs of the executing broker (Complaint ¶ 73); and "revenue sharing" with

brokers (Complaint ¶ 54).  Plaintiffs' allegations on these topics fail to link Wellington to any

alleged wrongdoing.[10]  To the extent plaintiffs' allegations can be read to  involve Wellington,

the actions alleged are all entirely consistent with governing SEC rules, and thus cannot form the

basis for a claim by plaintiffs.

1.      <u>Wellington Neither Received Nor Spent Any 12b-1 Marketing Fees</u>.

Plaintiffs assert in a heading on page 25 of the Complaint that "The Investment Adviser

Defendants Used Rule 12b-1 Marketing Fees for Improper Purposes."  Some distance later, at

¶ 88, the Complaint repeats this claim, alleging that "the Investment Adviser Defendants

received Rule 12b-1 fees" which Plaintiffs allege were improper because the Funds at issue were

---

[10] After describing Wellington as a party defendant in ¶ 23, plaintiffs do not mention Wellington
by name in any subsequent allegation.  Rather, the Complaint only mentions Wellington where it is
included in quotations from various Fund disclosure documents, disclosures which only tend to undercut
plaintiffs' claims as against Wellington.

closed.    Counts II, III  and V of the Complaint also allege that "the Investment Adviser Defendants" improperly charged investors in the Hartford Funds purported Rule 12b-1 marketing fees.  Complaint ¶¶ 127, 134, 151.

Wellington, of course, neither received nor spent any 12b-1 fees with regard to any Hartford Fund.  As an independent investment sub-adviser to the Funds, Wellington's contracts demonstrate that it had no role in any 12b-1 activities.  The Funds' SAI, from which the plaintiffs freely quote, also establishes this point.  SAI at pp. 91-93.  Consequently, to the extent the counts against Wellington are based on allegedly improper 12b-1 practices, these claims must be dismissed.  See Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) (where allegations in a complaint are contradicted by a document cited in the complaint, the document controls).

2.    Directed Brokerage Performed By Wellington Was Fully Disclosed and Permissible Under Applicable SEC Regulations.

The Complaint alleges that the "Investment Adviser Defendants" improperly directed Fund brokerage business in order to participate in "shelf-space programs" with brokers.  See, e.g., Complaint ¶¶ 73, 106(c).  In addition, Counts I, II, V, and VIII are based in part on alleged improper directed brokerage practices by the "Investment Adviser Defendants."  Complaint ¶¶ 119(c), 130, 151 and 165.  The Complaint alleges almost nothing about Wellington's involvement in these allegedly improper directed brokerage practices.  The only specific reference to Wellington and directed brokerage is in a lengthy quote from the March 1, 2003 SAI issued by the Funds—which only contradicts the plaintiffs' claims.  The quote states:

The Companies have no obligation to deal with any dealer or group of dealers in the execution of transactions in portfolio securities. Subject to any policy established by each Company's board of directors and HIFSCO, HIMCO and Wellington Management, as applicable, are primarily responsible for the investment decisions of each Fund and the placing of its portfolio transactions. In placing orders, it is the policy of each Fund to obtain the most favorable net

15

{B0356260; 6}

results, taking into account various factors, including price, dealer spread or commission, if any, size of the transaction and difficulty of execution. While HIMCO and Wellington Management generally seek reasonably competitive spreads or commissions, the Funds do not necessarily pay the lowest possible spread or commission. ***Upon instructions from HIFSCO, Wellington Management may direct certain brokerage transactions to broker/dealers who also sell shares of funds in the fund complex. Upon instructions from HIFSCO, Wellington Management may also direct certain brokerage transactions to broker/dealers that pay for certain other services used by the Funds.***

Although the rules of the National Association of Securities Dealers, Inc. ("NASD") prohibit its members from seeking orders for the execution of investment company portfolio transactions on the basis of their sales of investment company shares, under such rules, sales of investment company shares may be considered by the investment company as a factor in selecting brokers to effect portfolio transactions. Accordingly, some portfolio transactions are, subject to such rules and to obtaining best prices and executions, executed through dealers who sell shares of funds in the fund complex.

Complaint ¶ 105 (emphasis added).

Plaintiffs do not claim that directed brokerage was wrongful *per se*, but only that it was wrongfully carried out pursuant to alleged agreements with brokers regarding "shelf-space." The quoted disclosure from the SAI establishes that any such agreements would have involved HIFSCO, or other Hartford entities, but not Wellington. The Complaint does not allege to the contrary. Plaintiffs do not allege that Wellington was a party to any "shelf-space program," or indeed that Wellington's directed brokerage practices were anything other than what is disclosed. Their claims regarding directed brokerage as an element of an allegedly improper "shelf-space" scheme therefore fail to state a claim *against Wellington*.[11]

---

[11] That Wellington may have directed brokerage upon the instruction of HIFSCO does not rescue the plaintiffs' claim against Wellington. These fully disclosed directed brokerage practices were entirely permissible during the purported class period. As further described in the memorandum in support of the Hartford defendants' motion to dismiss, prior to the recent SEC rule change in September 2004, See Prohibition on the Use of Brokerage Commissions to Finance Distribution, 69 Fed. Reg. 54728 (Sep. 9, 2004) (Final Rule), concerning directed brokerage, the applicable SEC rule permitted investment companies to direct brokerage for the purpose of promoting sales of their shares so long as no additional expense is incurred. Order Approving Proposed Rule Change and Related Interpretation Under Section

3.    <u>Plaintiffs' "Soft Dollar" Allegations Fail to State a Claim Against Wellington</u>.

The Complaint alleges that, consistent with the claimed "shelf space" scheme, the "Investment Adviser Defendants" used "Soft Dollars as excessive commissions" to satisfy bilateral arrangements with brokers for shelf space.  <u>See, e.g.</u>, Complaint ¶¶ 86, 106(c).  Plaintiffs make numerous pejorative statements about these purported practices, but they fail to make any allegation that Wellington actually paid Soft Dollar commissions to any broker pursuant to any such agreement.  Plaintiffs are therefore left with only vague allegations that Wellington engaged in transactions that involved soft dollars.  Those allegations do not amount to well-plead claims against Wellington.

As the plaintiffs acknowledge, Section 28(e) of the Securities Exchange Act states that an investment management company does not breach its fiduciary duties "solely by reason of [its] having caused the account to pay a…broker…in excess of the amount of commission another…broker…would have charged for effecting the transaction, if such person determined in good faith that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided."  15 U.S.C. § 78bb(e).[12]  The Complaint's only direct mention of Wellington regarding soft dollar practices is in a quote from the March 1, 2003 SAI:

36 of the NASD, Release Nos. 17599, 11662, 46 Fed. Reg. 16102 (Mar. 10, 1981).  In fact, directed brokerage was deemed innocuous enough in 1998 that its disclosure was not even required in a fund's prospectus, only in its SAI, as was the case with the Funds.  <u>See</u> Registration Form Used By Open-End Management Inv. Co., Release No. IC-23064, Fed Reg. 13916-01, 1998 WL 107729 at *25 (Mar. 13, 1998).

[12] Plaintiffs go to some length in an attempt to describe how Section 28(e) allegedly does not apply in this case.  Once again, however, these more specific allegations are only directed at Hartford entities.  The Complaint claims that HIMCO and the Hartford were not entitled to the protections of Section 28(e) because "during the Class Period…Hartford's research sources are **100% in-house** research… [and] there is demonstrably little need for reliance on outside research."  Complaint ¶¶ 85-86 (emphasis in original).  As a result, plaintiffs continue, the "Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using Soft Dollars as excessive commissions…."  <u>Id.</u> at ¶ 86.  There is no support in the Complaint, or otherwise, for including

17

While HIMCO and Wellington Management seek to obtain the most favorable net results in effecting transactions in a Fund's portfolio securities, broker-dealers who provide investment research to HIMCO or Wellington Management may receive orders for transactions from HIMCO or Wellington Management. Such research services ordinarily consist of assessments and analyses of the business or prospects of a company, industry, or economic sector. If, in the judgment of HIMCO or Wellington Management, a Fund will be benefited by such research services, HIMCO and Wellington Management are authorized to pay spreads or commissions to brokers or dealers furnishing such services which are in excess of spreads or commissions which another broker or dealer may charge for the same transaction. Information so received is in addition to and not in lieu of the services required that HIMCO and Wellington Management must perform under the investment advisory agreement or the investment subadvisory agreement. The expenses of HIMCO and Wellington Management are not necessarily reduced as a result of the receipt of such information.

Complaint ¶ 109.

Notwithstanding their improperly undifferentiated claims against the "Investment Adviser Defendants" with regard to soft dollar payments, there is no allegation in the Complaint that Wellington did anything other than what this SAI described. These practices are entirely permissible.[13] See 15 U.S.C. § 78bb(e); see also soft dollar discussion in the Hartford defendants' memorandum in support of their motion to dismiss.

---

Wellington in this allegation. The assertion that Wellington, as an "Investment Adviser Defendant," is not entitled to the protections of Section 28(e) because the Hartford relies on "in-house research" is obviously a pleading non sequitur. In fact, plaintiffs have made no allegations that Wellington failed to seek best execution on any trades for the Funds, or that any soft dollar practices in which Wellington may have engaged are not covered by Section 28(e).

[13] To the extent Plaintiffs purport to charge Wellington with participation in the fourth category of alleged improper conduct, revenue sharing with brokers, they are wrong and this claim is unsupported by any specific allegation of fact. Wellington received the amount of compensation specified in its arm's-length contracts with HIFSCO. It had no involvement in either making or receiving compensation for any alleged revenue sharing activities.

{B0356260; 6}

C.   <u>Plaintiffs' Claims Based On Alleged Failures To Disclose Information To The
Funds' Shareholders Fail To State Any Claim Against Wellington Because
Wellington Has No Such Disclosure Obligation As An Independent Sub-Adviser
To The Funds</u>.

The Complaint also alleges that the "Investment Adviser Defendants" failed to disclose

various aspects of the so-called "shelf-space" agreements with brokers, and that these alleged

failures to disclose violated various securities and common laws.  Counts I, II, III, V, and VI all

purport to state causes of action based in whole or in part on alleged failures to disclose various

purported "shelf space" arrangements.  These allegations are completely misapplied to

Wellington because, as an independent investment sub-adviser to the Funds, Wellington had no

obligation to make any such disclosures to the public, nor did Wellington "control" in any sense

the Hartford entities that made or participated in making such disclosures.  (<u>See</u> *supra* at p. 12).

Plaintiffs' claims against Wellington regarding these allegedly deficient public disclosures are

once again based only on improper group pleading allegations against the "Investment Adviser

Defendants."  These misdirected conclusory allegations fail to state a claim against Wellington.

<u>See</u> <u>In re Am. Express Co. Shareholder Litig.</u>, 39 F.3d at 400-01 n.3.


IV.   <u>ALL COUNTS OF THE COMPLAINT ARE LEGALLY DEFICIENT AND SUBJECT
TO DISMISSAL FOR INDEPENDENT REASONS</u>

The Complaint as a whole should be dismissed as against Wellington for the reasons

discussed above.  In addition, each of the counts in the complaint is legally deficient and subject

to dismissal as against all defendants on myriad grounds.  These grounds are articulated in detail

in the memorandum of the Hartford defendants in support of their motion to dismiss.  Wellington

adopts and incorporates by reference the arguments for dismissal set forth in that memorandum.

For the reasons described below, however, Counts I (§ 34(b) of the ICA), III (§ 36(b) of the ICA)

and V (§§ 206 and 215 of the IAA) also fail to state a claim for reasons particular to Wellington.

19

A.     <u>Count I Fails to State a Claim Against Wellington Because It Is Based on Disclosure Obligations That Do Not Implicate Wellington</u>.

Count I alleges that the Funds' "Prospectuses" and other unspecified documents violated § 34(b) because they were materially misleading in failing to disclose the claimed "shelf-space" scheme, and that this claimed violation caused injuries "directly" to the Funds' shareholders. Complaint ¶ 118-22.  In addition to the prospectuses, the only other documents specifically referenced in the Complaint subject to the requirements of § 34(b) are the Funds' SAIs.  <u>See, e.g.</u>, Complaint ¶¶ 103-10.

Plaintiffs' § 34(b) count cannot state a claim against Wellington because Wellington had no involvement in, nor responsibility for, the Funds' prospectuses and SAIs.  As discussed *supra* at p. 19, Wellington's arm's-length contracts establish that as an investment sub-adviser to the Funds it is not involved in these disclosure documents.  Consequently, even if the Court finds that § 34(b) of the ICA creates a private right of action,[14] plaintiffs have failed to allege any facts which could state such a claim against Wellington.

B.     <u>Count III Fails to State a Section 36(b) Claim Against Wellington</u>.

In Count III plaintiffs charge that the "Investment Adviser Defendants" "had a fiduciary duty to the Hartford Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to . . . the Investment Adviser Defendants."

---

[14] In Count I plaintiffs purport to bring a private right of action pursuant to § 34(b) of the ICA, which prohibits false statements of material fact in registration statements and other public disclosures required by the ICA.  15 U.S.C. § 80a-33(b).  As addressed in greater detail in the memorandum in support of the Hartford defendants' motion to dismiss, the statute makes no reference to a private right of action, and the overwhelming weight of authority in this circuit on the subject has held that no private right of action exists.  <u>See, e.g.</u>, <u>In re Merrill Lynch & Co. Research Reports Secs. Litig.</u>, 272 F. Supp. 2d 243, 258-59 (S.D.N.Y. 2003) (finding no evidence of contemporaneous Congressional intent to create private right of action under § 34(b)), <u>citing</u> <u>Olmstead v. Pruco Life Ins. Co.</u>, 283 F.3d 429 (2d Cir. 2002); <u>Dorchester Investors v. Peak Int. Ltd.</u>, 134 F. Supp. 2d 569 (S.D.N.Y. 2001) (same).  Consequently, Count I should be dismissed as against all defendants.

{B0356260; 6}

Complaint ¶ 134.  Plaintiffs then claim that the "Investment Adviser Defendants" "violated

Section 36(b) by improperly charging investors in the Hartford Funds purported Rule 12b-1

marketing fees, and by drawing upon the assets of Hartford Funds investors to make undisclosed

payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-

1." Id. at ¶ 134.  Plaintiffs fail to state a § 36(b) claim against Wellington because: (a) plaintiffs

make no allegation regarding any breach of fiduciary duty with regard to Wellington's sub-

advisory fees, the only payments received by Wellington from any Hartford entity; and (b)

plaintiffs' allegations regarding the alleged "shelf space" payments are outside the scope of

§ 36(b).

        1.      <u>Plaintiffs Make No Allegation Regarding Any Violation of § 36(b) With Regard to Wellington's Sub-Advisory Fees</u>.

In 1970, the ICA was amended to add § 36(b), which provides that an investment adviser

has a fiduciary duty "with respect to the receipt of compensation for services, or of payments of a

material nature paid by such investment company, or by the security holders thereof, to such

investment adviser . . . ." 15 U.S.C. § 80a-35(b).  The new § 36(b) also added language that

provides that either the SEC or shareholders may bring an action against an investment adviser

"for breach of fiduciary duty in respect of such compensation or payments paid …to such

investment adviser.…" Id.

This amendment to the ICA was intended to address the potential for self dealing arising

from the fact that the investment adviser who creates a mutual fund company often "manages,

operates and supervises most every aspect of the company…." In re Nuveen Fund Litig., No. 94

C 360, 1996 WL 328006, at *10 (N.D. Ill. Jun. 11, 1996) (internal citation omitted).  Because of

"the adviser's control over its funds, the danger of self-dealing is particularly acute." Id.  On this

point, the Second Circuit observed in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d

923, 928 (2d Cir. 1982), that "[t]he Senate recognized that as a practical matter the usual arm's

length bargaining between strangers does not occur between an adviser and the fund . . . ."  As

quoted by the Court, the Senate Report on the relevant bill stated:

> Since a typical fund is organized by its investment adviser which provides it with almost
> all management services and because its shares are bought by investors who rely on that
> service, a mutual fund cannot, as a practical matter sever its relationship with the adviser.
> Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry
> in the same manner as they do in other sectors of the American economy.

Id.; quoting Investment Company Amendments Act of 1970, S.Rep. No. 91-184, 91st Cong., 2d

Sess. (1970), reprinted in U.S. Code Cong. & Ad. News 4897, 4901 [1970].

The potential for self-dealing Congress addressed by enacting § 36(b) is entirely absent

from Wellington's independent sub-adviser relationship to the Hartford Funds.  Unlike the

typical case described in the legislative history, as a sub-adviser Wellington's contracts are with

the adviser/manager HIFSCO, not the Funds, and Wellington did not organize, manage,

supervise or control the Funds.  Indeed, there is no allegation to suggest that Wellington's

contracts with HIFSCO were anything other than arm's-length.  The Complaint misses these

fundamental points, and in so doing, fails to make any allegations against Wellington that could

state a § 36(b) claim.[15]

As demonstrated by Wellington's contracts with HIFSCO, the only fees Wellington

received in exchange for its investment sub-advisory services were its advisory fees.  Wellington

---

[15] Moreover, as noted above, Section 36(b) provides a cause of action for recovery of excessive
compensation paid to an investment adviser by a "registered investment company or the security holders
thereof."  The section also limits the damages payable by any person to no more than the "amount of
compensation or payments received from such investment company, or the security holders thereof, by
such recipient."  In this case, Wellington, as a sub-adviser, is paid solely by HIFSCO, not the Hartford
funds or their shareholders.  Plaintiffs have not alleged that Wellington received any other form of
compensation from the funds or their shareholders.  Accordingly, Section 36(b), by its terms, arguably
provides no basis for the plaintiffs to recover from Wellington.

{B0356260; 6}

received no 12b-1 money, nor any other fees from any Hartford entity.  Yet the Complaint makes

no allegations whatever regarding the amount of Wellington's sub-advisory fees nor the measure

of the investment sub-advisory services Wellington provided under its contracts in relation to its

sub-advisory fees.  Plaintiffs make only two references to these fees.  First, the Complaint states,

unremarkably, that the "[f]ees payable to the Investment Adviser Defendants are calculated as a

percentage of fund assets under management."  Complaint ¶ 25.  Second, the Complaint quotes

from a SAI for the Funds that describes the approval by the Board of Directors for each relevant

Fund of Wellington's advisory fee, as well as the fees paid to HIFSCO and HIMCO.  Complaint

¶ 66.  The Complaint goes on to ignore Wellington, however, and instead claim that, contrary to

the SAI "[i]n truth and in fact, however, Hartford Financial" controlled the Hartford Funds

Boards of Directors such that the Board failed "to prevent Hartford Financial from skimming

Hartford Financial [sic] assets and charging excessive fees."  Complaint ¶ 67.

 Once again, the Complaint is obviously targeted at the Hartford entities, and not against

the independent sub-adviser Wellington.  This complete failure to make any allegation regarding

the relationship between the amount of Wellington's advisory fees and the services rendered

dooms plaintiffs' § 36(b) count against Wellington.  See, e.g., Gartenberg, 694 F.2d at 928 (to

find a § 36(b) violation the plaintiff must show that the fee received is so disproportionate to the

services rendered that it could not be the product of arm's-length bargaining);  Migdal, 248 F.3d

321, 327 (dismissal of plaintiffs' § 36(b) claim upheld because plaintiffs failed to allege any facts

pertinent to the relationship between the fees the advisers received and the services rendered);

Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140, 143 (3d Cir. 2002) (same).

Plaintiffs' § 36(b) count against Wellington as one of the "Investment Adviser Defendants" must

therefore be dismissed.

2.    <u>Plaintiffs' Allegations Regarding Payments to Brokers Do Not State a Section 36(b) Claim Against Wellington.</u>

Yet another reason plaintiffs' § 36(b) claim against Wellington cannot be sustained is that the claim is based on allegations of payments to third party brokers, not to Wellington, and such payments are outside the scope of § 36(b). Section 36(b) is explicit in limiting the application of the fiduciary duty it creates to the payments *received* by the investment adviser. In place of allegations about the size of the fees Wellington received as a sub-adviser to the Funds in relation to the services Wellington provided, plaintiffs ask this court to expand the scope of the statute dramatically by permitting a § 36(b) claim based on allegations that the *payment* of "Soft Dollars and excessive commissions" to *brokers* could violate § 36(b).[16] Complaint ¶ 134. The court should decline this invitation because it lacks support in both the statute itself and the relevant case law.

In rejecting a § 36(b) claim seeking to broaden the scope of § 36(b), much as plaintiffs attempt to accomplish here, the <u>Migdal</u> court emphasized the relevant statutory language:

> [se]ection 36(b) imposes on an investment adviser a 'fiduciary duty *with respect to the receipt of compensation for services*.' And Section 36(b) grants individual investors a private right of action only 'for breach of fiduciary duty *in respect of such compensation*.' As the statutory text indicates, Section 36(b) is sharply focused on the question of whether the fees themselves were excessive.…

<u>Migdal v. Rowe Price-Fleming Int'l Inc.</u>, 248 F.3d 321, 328 (4th Cir. 2001) (emphasis in original quotations of 15 U.S.C. § 80a-35(b)). The court therefore upheld the dismissal of the plaintiffs' claims regarding improper self-interest by the fund directors, holding that "[g]eneral breach of

---

[16] The Complaint also claims that the "Investment Adviser Defendants" violated § 36(b) by "improperly charging investors . . . purported Rule 12b-1 marketing fees . . . ." Complaint ¶ 134. As described *supra* at p. 4, pursuant to its contracts, Wellington had no involvement in any 12b-1 practices, and this allegation cannot state a claim against Wellington.

fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees" are not within the scope of § 36(b).  Id.

     Similarly, in Green v. Nuveen Advisory Corp., 295 F.3d 738, 742 (7th Cir. 2002) the plaintiffs claimed that an alleged conflict of interest arising in connection with the advisers' role as decision-makers for the fund resulted in a violation of § 36(b).  The Court rejected this claim, holding that "Congress enacted § 36(b) to provide a narrow federal remedy that is significantly more circumscribed than common law fiduciary duty doctrines."  Id. at 743 (internal quotation omitted).  See also In re Nuveen Fund Litig., No. 94 C 360 1996 WL 328006, at *12-14 (N.D. Ill. Jun. 11, 1996) (the statutory language "indicates a standard of care that only runs to the terms and receipt of compensation and not one that broadly governs an investment adviser's performance….  Accordingly, every court addressing a § 36(b) claim has required the plaintiff to demonstrate that compensation or payment received by the investment adviser was disproportionate to the services rendered.") (collecting cases); Halligan v. Standard & Poor's/Intercapital, Inc., 434 F. Supp. 1082, 1085 (E.D.N.Y. 1977) (section 36(b) must be narrowly read to mean only recipients of fees may be held liable for breach of fiduciary duty with respect to such payments).

     Plaintiffs' claims that payments of various kinds to brokers could themselves constitute a § 36(b) violation by Wellington is therefore without support either in the language of the statute or in the case law.  Even if the Court were to determine that these payments are somehow improper, they cannot support a § 36(b) claim because they have nothing to do with Wellington's "fiduciary duty *with respect to the receipt of compensation for services*."  15 U.S.C. § 80a-35(b) (emphasis added).

C.    <u>Count V Fails to State a Claim Against Wellington Because Plaintiffs Have Not Pled Fraud Against Wellington</u>.

Plaintiffs allege in Count V that "Investment Adviser Defendants" violated § 206 of the Investment Advisers Act ("IAA") by "engaging in a deceptive contrivance…which operated as a fraud upon the Hartford Funds" and by "engaging in…practices and courses of business…so as to constitute a deceit or fraud upon the Hartford Funds."  Complaint ¶¶ 150.  Plaintiffs further claim that the "Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein.  The Investment Adviser Defendants, because of their position of authority and control over the Hartford Funds were able to and did control the fees charged and collected, and otherwise control the operations of the Hartford Funds."  <u>Id.</u>

As purportedly applied to Wellington as an "Investment Adviser Defendant," these allegations once again fail to address Wellington's independent arm's-length sub-advisory relationship with the Funds.  Most fundamentally, in making their § 206 claim, plaintiffs again erroneously and improperly allege that Wellington bears responsibility because it "controlled" the Funds or the fees paid by the Funds.  Because plaintiffs' § 206 claim is based on this unsupported assertion of control, and because plaintiffs fall well short of the heightened pleading requirement of § 206, this claim should be dismissed.[17]

This count, like the entire Complaint, is based on plaintiffs' theory that the "Investment Adviser Defendants" made payments to brokers pursuant to "shelf-space" agreements, and that these payments were improper.  Plaintiffs repeatedly charge that the "Investment Adviser Defendants" were able to accomplish these improper payments because of their "control" over

---

[17] This count is brought derivatively on behalf of the Funds.  Count V should also be dismissed because plaintiffs have failed to allege why demand on the Board of Directors would have been futile with respect to alleged wrongdoing by Wellington.  <u>See</u> <i>supra</i> at section II.

{B0356260; 6}

the Fund Directors and thereby the Funds.  As described *supra*, these claims are simply

misplaced as applied to the independent sub-adviser Wellington.  Wellington does not control the

Funds, and plaintiffs have made no allegations of specific fact that could tie Wellington to these

alleged agreements.   Like the other counts based on these improperly pled allegations brought

against Wellington only as an "Investment Adviser Defendant," the § 206 count fails to state a

claim.

The Complaint's uniform refusal to differentiate between Wellington and the Hartford

investment advisers fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 12(b)(6).

Plaintiffs' § 206 claim must also fail because, by necessity, plaintiffs have not met the

heightened pleading standard of Fed. R. Civ. P. 9(b) applicable to § 206 claims.  See Polera v.

Altorfer, Podesta, Woolard & Co., 503 F. Supp. 116, 119 (N.D. Ill. 1980) ("Because the basis for

a violation of Section 206 of the Advisers Act is a fraudulent transaction, a claim founded upon

that statute is one which necessarily must be pleaded with Rule 9 specificity").  Because

plaintiffs' § 206 claim repeatedly alleges fraud and deceit, the claim clearly sounds in fraud, and

Rule 9(b) applies.  That rule requires that "[i]n all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P.

9(b).  Conclusory allegations of fraud unsupported by specific facts do not meet the heightened

pleading requirement of Rule 9(b), and do not state a § 206 claim.  See Polera, 503 F. Supp. at

119.  Plaintiffs' fail to plead any specific facts alleging Wellington's participation in the

allegedly fraudulent scheme, and the § 206 claim should therefore be dismissed.

## CONCLUSION

For the foregoing reasons Wellington submits that the Complaint as against it should be dismissed in its entirety.

Respectfully submitted,
WELLINGTON MANAGEMENT
COMPANY, LLP

By its attorneys,

December 20, 2004

_____
Ira K. Gross (ct-03747)
William T. Matlack (ct-26079)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
Telephone: (617) 338-2800
Facsimile: (617) 338-2880
Email: igross@sandw.com
wmatlack@sandw.com

_____
Francis J. Brady (ct-04296)
Marilyn B. Fagelson (ct-17202)
MURTHA CULLINA LLP
CityPlace I-185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
Email:  fbrady@murthalaw.com
mfagelson@murthalaw.com

{B0356260; 6}

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Wellington Management Company, LLP's

Memorandum in Support of Motion to Dismiss was mailed first-class, postage prepaid, on this

20th day of December, 2004, to:


Kim E. Levy
Michael R. Reese
Steven G. Schulman
Milberg Weiss Bershad& Schulman
One Pennsylvania Plaza
Suite 4915
New York, NY 10119-0165

Brian C. Fournier
J. Daniel Sagarin
David A. Slossberg
Hurwitz Sagarin & Slossberg
147 North Broad Street
PO Box 112
Milford, CT 06460-0112

Charles J. Piven
Marshall N. Perkins
Law Offices of Charles J. Piven, P.A.
The World Trade Center – Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202

Jeffrey S. Nobel
Andrew M. Schatz
Schatz & Nobel
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103

Patrick A. Klingman
Shepard Finkelman Miller & Shah
65 Main Street
Chester, CT 06412

{B0356260; 6}

David Randell Scott
Erin Green Comite
Neil Rothstein
Scott & Scott
108 Norwich Avenue
PO Box 192
Colchester, CT 06415

Eric J. Belfi
Brian P. Murray
Murray Frank & Sailer
275 Madison Avenue, Suite 801
New York, NY 10016

Stuart J. Baskin
Jerome S. Fortinsky
John D. Roesser
Scott C. Shelley
Vikram Sidhu
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022

Thomas J. Groark, Jr.
Mitchell R. Harris
Maureen O'Connor
Day Berry & Howard
CityPlace I
185 Asylum Street
Hartford, CT 06103-3449

Katherine Ann Burroughs
Robert E. Grady
Samuel A. Gunsburg
Dechert LLP
90 State House Square – 12th Floor
Hartford, CT 06103

William Kennedy Dodds
Samuel A. Gunsburg
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112-2200

{B0356260; 6}

David A. Kotler
Dechert LLP
Princeton Pike Corporate Center
PO Box 5218
Princeton, NJ 08543-5218

Ira K. Gross
William T. Matlack
Sullivan & Worcester
One Post Office Square
Boston, MA 02109

_____

Francis J. Brady