## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

—————————————————————————x

IN RE HARTFORD MUTUAL FUNDS FEE     :     MASTER FILE: 3:04CV00344 (AWT)
LITIGATION     :

                                         :     Dated:    January 30, 2007

**THIS DOCUMENT RELATES TO: ALL**     :
**ACTIONS**     :

—————————————————————————x

## SECOND CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included, among other things, interviewing of confidential sources, a review of

United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory

filings, investigations, reports, advisories, press releases, media reports, news articles, academic

literature, and academic studies. Plaintiffs believe that substantial additional evidentiary support

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1.       This is a federal class action based upon The Hartford Financial Services Group,

Inc. ("Hartford"), and those of its subsidiaries and affiliates also named herein as Defendants,

charging Hartford mutual fund investors excessive fees and expenses that they then used, in part,

to pay and induce brokers to steer more investors into the Hartford mutual funds (the "Hartford

Funds" or the "Funds"). As a result of their material omissions regarding this conduct and other

conduct detailed below, Defendants are liable under Sections 34(b), 36(a) and 48(a) of the

Investment Company Act of 1940 (the "ICA") to a class (the "Class") of all persons or entities

who held one or more shares of any of the Funds in the Hartford complex, during the period of

January 30, 1999 to November 17, 2003 (the "Class Period"). Defendants are also liable under

Sections 36(b) and 48(a) of the ICA because, during the relevant period of February 27, 2003

through February 27, 2004 and to the present (the "relevant period"), the advisory and other fees

received by Defendants and their affiliates were disproportionate to the value of the services

2

provided and not within the bounds of what would have been negotiated in an arm's-length transaction. Thus, the fees received by the Defendants in connection with the Funds held by the 36(b) Plaintiffs (defined below) (the "36(b) Funds") were received in violation of the ICA.[1]

2.     In essence, Defendants used Hartford Fund investor assets to pay kickbacks to brokerages in exchange for the brokerages steering their clients into Hartford Funds. Defendants referred to this as buying "shelf space" at the brokerages. Then, once invested, the investors in Hartford Funds were charged, and paid, undisclosed fees to Defendants that were used by Defendants to pay brokers to push Hartford Funds on yet more investors in order to increase the level of investment in Hartford Funds.

3.     Defendants' practice of charging excessive fees and commissions to Hartford Funds investors to pay and induce brokers to steer investors into the Hartford Funds necessarily created insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but in fact were only concerned with their pay-offs from Defendants.

4.     The practice of charging excessive fees and commissions also created insurmountable conflicts of interest for the Investment Adviser Defendants who had a duty to act in the best interests of fund investors, but were, in fact, only concerned with siphoning fees from the Funds to induce brokers to artificially increase the amount of money invested in the Hartford Funds. The Investment Adviser Defendants were motivated to engage in this undisclosed plan of charging excessive fees to induce brokers to steer investors into Hartford Funds because the fees they collected for managing and advising the Hartford Funds were calculated as a percentage of assets under management and, therefore, increased as the number of Hartford Funds investors

---

[1] The 36(b) Funds are: Hartford Advisers Fund, Hartford Capital Appreciation Fund, Hartford Dividend and Growth Fund, Hartford MidCap Fund, and Hartford Stock Fund.

3

grew.  According to a former Regional Sales Manager employed during the Class Period, employees were instructed to sell mutual funds to the public during the Class Period strictly to raise revenue for the company.  Consequently, the interests of investors were not protected.

5.      Defendants purposely omitted disclosing the nature of the excessive fees and commissions charged to Plaintiffs and the other Class members, and the resulting conflicts of interest, as they realized that the inducements created insurmountable conflicts of interest significant to any reasonable person deciding how to invest his or her money.

6.      In actions to date against Morgan Stanley DW, Inc., Massachusetts Financial Services, Inc., Fleet Investment Advisors, Inc., Franklin Advisers, Inc., Deutsche Investment Management Americas, Inc., PA Fund Management LLC, OppenheimerFunds, Inc., *and recently Defendants themselves,* among others, the SEC has condemned the practices complained about here, stating that they create insurmountable, undisclosed conflicts of interest in violation of the securities laws.  *See In the Matter of Hartford Inv. Fin. Services, LLC, HL Inv. Advisors, LLC, and Hartford Sec. Distribution Co., Inc.*, 2006 SEC LEXIS 2571, at *15 (November 8, 2006) (the "SEC Hartford Order").  In similar enforcement actions, the National Association of Securities Dealers ("NASD") also has condemned these practices and concluded that such practices violate NASD Rule 2830(k).

7.      As described by Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 article in *The Los Angeles Times* about a Senate committee hearing on mutual funds, the mutual fund industry "is indeed the world's largest skimming operation," tantamount to "a $7-trillion trough exploited by fund managers, brokers and other insiders."

8.      On January 9, 2004, Hartford's scheme was exposed when *The Wall Street Journal* revealed a "shelf space" scheme between broker-dealer Edward Jones and Hartford.

Hartford's practices have since resulted in ongoing investigations by the SEC, NASD and state regulators.

9.      Also, during the relevant period, compensation and fees paid to the Investment Adviser and Distributor Defendants (as defined below) rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the 36(b) Funds or their investors in return for the additional fees.

10.     One reason for the dramatic increase in compensation to the Investment Adviser Defendants, Distributor Defendants and their affiliates, was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund shares through participation in so-called "revenue sharing" or "shelf-space" programs. Among other things, those programs included: (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds ("directed brokerage"); and (c) "Soft Dollar" commission arrangements with brokers (these cash payments, directed brokerage and Soft Dollar arrangements are collectively referred to as "revenue sharing"). These payments resulted in the growth of the Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their advisory and other asset-based fees to increase. The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations. They engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds or their investors, or by additional benefits to the Funds or their investors.

11.     Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per-share basis,

Defendants failed to reduce their fees as a percentage of assets to pass on the economies of scale to the 36(b) Funds or their investors. Instead, they utilized the economies of scale to their own benefit. The Investment Adviser Defendants' intention to retain the benefits of economies of scale to themselves is clearly reflected, for example, in the inadequate management fee breakpoint discounts, many of which have been illusory and ineffective since 2000.

12.     The fee structure imposed by Defendants on the 36(b) Funds and their investors far exceeded the fees that would be paid as a result of arm's-length bargaining. Fees for essentially the same services paid by similar funds not affiliated with Defendants were substantially less. Moreover, Defendants' publicly-reported profits for managing the Funds increased greatly before and during the relevant period, and none of these gains was passed to the 36(b) Plaintiffs in the form of lower fund fees. The nature and quality of the services provided by Defendants did not justify the excessive fees charged as the 36(b) Funds overall significantly underperformed similar funds.

13.     In addition, Fund assets were used to pay excessive "Rule 12b-1" fees to the Distributor Defendants without any benefit accruing to the 36(b) Funds or their investors from those payments. Defendants' management fees were also excessive because they used fund assets to pay their out-of-pocket expenses even though they were already being compensated on a basis that reimbursed them for such expenses. For example, they caused the Funds to make "Soft Dollar" commission payments to brokers, through which brokers were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions, in return for services that would normally be provided by the adviser and for which the adviser was already being paid. Soft Dollar commissions were utilized by Defendants to shift significant expenses from the Investment Adviser Defendants to the Funds and their investors without any corresponding offset in the level of the management fee.

6

14.   Furthermore, the Directors of the Funds failed to satisfy their duty independently and conscientiously to evaluate the Funds' 12b-1 and advisory fee arrangements, a factor which strongly supports a finding of fee excessiveness. The Directors failed to perform their duties as the "watchdogs" of the Funds because they failed to obtain enough information adequately to evaluate the Funds' distribution fees as required by Rule 12b-1, or approved those fees in the face of information showing that the distribution program was failing to benefit the 36(b) Funds. In fact, the SEC specifically found that the Investment Adviser Defendants were able to keep the Directors from discovering the pillage of fund assets through directed brokerage. SEC Hartford Order at *16-17. As a result, they were unable to, and did not, evaluate whether Defendants' use of Fund assets for revenue sharing agreements was in the Funds' and their investors' best interest and whether the fees being charged were excessive. Indeed, the 12b-1 fees charged to each of the 36(b) Funds were significantly higher than those charged to comparable funds. Moreover, the increase in the Funds' net assets, accompanied by an increase in the expense ratios and Defendants' failure to reduce their fees sufficiently, were red flags which the Directors disregarded, as was the fact that other comparable funds were paying substantially lower fees for similar services. In fact, the Funds' Directors were unable independently and conscientiously to serve the Funds. Of the seven independent directors, only two have disclosed previous investment management experience. Moreover, these seven purported "independent" directors were charged with the impossible task of adequately evaluating the fees for a minimum of 72 funds on a fund-by-fund basis -- many more funds than a director can or should be responsible for. As a result, the Directors did not perform their duties as "watchdogs" of the Funds because they failed to ensure that any economies of scale that were being realized from the increase in Fund assets were passed to the Funds and their investors, and that the fees paid by the Funds to Defendants were not excessive. The Directors' failure to satisfy their duties resulted in excessive

7

fees being charged to the Funds that were disproportionate to the services rendered and were not the product of arm's-length bargaining.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 34(a), 36(a), 36(b) and 48(a) of the ICA, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43.

17.     Many of the acts charged herein occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendant Hartford was at all relevant times, and still is, headquartered in this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

19.     Plaintiff Linda Smith held during the Class Period and the relevant period, and continues to own shares or units of the Hartford Dividend and Growth Fund, Hartford Advisers Fund, Hartford Stock Fund and Hartford MidCap Fund and has been damaged by the conduct alleged herein.

20.     Plaintiff Brian Abrams held during the Class Period and the relevant period, and continues to own shares or units of the Hartford Capital Appreciation Fund and Hartford MidCap Fund and has been damaged by the conduct alleged herein.

21.     Plaintiff Bo Bortner held during the Class Period and the relevant period, and continues to own shares or units of the Hartford Capital Appreciation Fund and has been damaged by the conduct alleged herein.

22.     Linda Smith, Brian Abrams, and Bo Bortner are collectively referred to herein as the "36(b) Plaintiffs."

23.     Plaintiff Jacky Rollins held during the Class Period shares or units of the Hartford Advisers Fund and has been damaged by the conduct alleged herein.

24.     Plaintiff Maurice S. Thews held during the Class Period shares or units of the Hartford High Yield Fund and has been damaged by the conduct alleged herein.

### The Parent Company

25.     Defendant Hartford is a Connecticut financial services company with its principal place of business at Hartford Plaza, 690 Asylum Avenue, Hartford, Connecticut 06115.

### The Investment Advisers

26.     Defendant Hartford Investment Financial Services, LLC (f/k/a Hartford Investment Financial Services Company) (''HIFSCO'') is the investment manager to each Fund. HIFSCO is a wholly-owned indirect subsidiary of Hartford.  HIFSCO had over $20.8 billion in assets under management as of December 31, 2003.  Hartford Mutual Funds, Prospectus for 2004 (Form 485BPOS) (Feb. 27, 2004).  HIFSCO is responsible for the management of each Fund and supervises the activities of the investment sub-advisers described below.  HIFSCO is principally located at 200 Hopmeadow Street, Simsbury, Connecticut 06089.

27.     Defendant Wellington Management Company, LLP (''Wellington Management'') is the investment sub-adviser to each of the Funds, other than those sub-advised by HIMCO (defined below).  Wellington Management, a Massachusetts limited liability partnership, is a professional investment counseling firm that provides services to investment

9

companies, employee benefit plans, endowments, foundations and other institutions and individuals. Wellington Management and its predecessor organizations have provided investment advisory services since 1928. As of December 31, 2003, Wellington Management had investment management authority over approximately \$394 billion in assets. Hartford Mutual Funds, Prospectus for 2004 (Form 485BPOS) (Feb. 27, 2004). Wellington Management is principally located at 75 State Street, Boston, Massachusetts 02109.

28.     Defendant Hartford Investment Management Company (''HIMCO'') is the investment sub-adviser to each of the Funds, other than those sub-advised by Wellington Management.[2] HIMCO is a professional money management firm that provides services to investment companies, employee benefit plans and insurance companies. HIMCO is a wholly-owned subsidiary of Hartford. As of December 31, 2003, HIMCO had investment management authority over approximately \$32.4 billion in assets. Hartford Mutual Funds, Prospectus for 2004 (Form 485BPOS) (Feb. 27, 2004). HIMCO is principally located at 55 Farmington Avenue, Hartford, Connecticut 06105.

29.     HIFSCO, HIMCO and Wellington Management are referred to collectively herein as the "Investment Adviser Defendants."

**The Distributors**

30.     Defendant HIFSCO acts as the underwriter and distributor of shares of Hartford's U.S.-registered open-end mutual Funds.

31.     Upon information and belief, Defendant Hartford Securities Distribution Company, Inc. ("Hartford Securities"), located at 200 Hopmeadow Street, Simsbury,

---

[2] As of March 1, 2004, HIMCO was the sub-adviser to the High Yield Fund, Income Fund, Inflation Plus Fund, Money Market Fund, Short Duration Fund, Tax-Free California Fund, Tax-Free Minnesota Fund, Tax-Free National Fund, Tax-Free New York Fund, Total Return Bond Fund and U.S. Government Securities Fund. Hartford Mutual Funds, Prospectus for 2004 (Form 485BPOS) (Feb. 27, 2004).

Connecticut, an indirect wholly-owned subsidiary of Hartford, also acts as the underwriter and distributor of shares of certain of Hartford's U.S.-registered open-end mutual Funds.

32.     Upon information and belief, Defendant PLANCO Financial Services Inc. ("PLANCO"), located at 200 Hopmeadow Street, Simsbury, Connecticut, a wholly-owned subsidiary of Hartford Life Insurance Co., also acts as the wholesaler and distributor of shares of certain of Hartford's U.S.-registered open-end mutual Funds.

33.     Defendants HIFSCO, Hartford Securities and PLANCO are referred to collectively herein as the "Distributor Defendants."

## SUBSTANTIVE ALLEGATIONS

## DEFENDANTS BREACHED THEIR DUTIES BY CHARGING EXCESSIVE FEES NOT REASONABLY RELATED TO THE SERVICES PROVIDED

34.     Under the ICA, the fee charged to mutual fund investors should be the equivalent of fees that would have resulted from arm's-length bargaining. Mutual fund directors are required to negotiate the fees charged to the fund on behalf of the investors (who, individually, are unable to negotiate such fees), and on behalf of the fund, which is otherwise under the control of the fund's adviser or distributor. At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to the funds and their investors, in that the fees must be reasonably related to the services provided.

### The Fees At Issue

35.     Investment Advisory Fees: Investment advisory fees are calculated as a percentage of assets under management. Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.*, for choosing the securities in which a mutual fund should invest and the operations required to support the management of the portfolio. As the fund assets increase, the dollar amount of such fees parallels this growth.

36.     Rule 12b-1 Fees:  As discussed above, SEC Rule 12b-1 permits a fund to pay
"12b-1" distribution fees out of fund assets only if the fund has adopted a 12b-1 plan authorizing
their payment, and only if the Directors properly find that there is a reasonable likelihood that the
plan will benefit the fund and its shareholders.  Legitimate uses of 12b-1 distribution fees include
payments for the cost of marketing and selling fund shares (such as compensation for brokers
and others who sell fund shares, and payments for advertising, the printing and mailing of
prospectuses and sales literature).  Like the investment advisory fees, the 12b-1 fees are
calculated as a percentage of assets under management and the dollar amount of such fees
increases with the size of the fund.

37.     Transfer Agency Fees:  Transfer agency fees are paid to either an affiliated or
independent third party to handle sales and redemptions of fund shares, to maintain shareholder
records, to compute the net asset value (the "NAV") of the fund daily, and to pay out dividends
and capital gains.  Like the investment advisory fees and 12b-1 fees, the transfer agency fees are
calculated as a percentage of assets under management and the dollar amount of such fees
increases with the size of the fund.  These fees can constitute "fall-out" benefits to the
Investment Adviser as a result of its relationship with the Funds, and must be considered in
evaluating whether the fees paid were excessive.

38.     Administrative Fees:  Administrative fees are generally paid by funds to cover the
cost of responding to investor inquiries, providing investors with information about their
investments, and other services required to enable the functioning of the fund.  Unlike 12b-1
distribution fees, a fund may pay administrative fees without adopting a 12b-1 plan.
Accordingly, such fees are often not visible to investors and are highly susceptible to
excessiveness by Investment Advisers.  Like the investment advisory fees and the 12b-1 fees, the

12

administrative fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

39.     These fees are the principal components of a fund's expense ratio, which is the ratio of total expenses to net assets. The expense ratio determines the fund's efficiency and cost effectiveness, and consequently a lower number is desirable because it reflects higher total returns. The expense ratio of a fund is considered in the industry to be a key indicator of a fund's performance. The *ex parte* ratio is usually presented as a percentage, but when translated into a dollar amount it can be significant. For the Hartford Funds at issue in this case, Exhibit A illustrates the actual dollar amounts spent by the 36(b) Funds on expenses as well as advisory and 12b-1 fees.

### Factors That Show The Fees Charged To The Funds By The Defendants Were Not Reasonably Related To The Services Provided To The Funds

40.     The mutual fund industry recognizes that certain factors indicate that fees are excessive. In particular, the following factors, *inter alia*, illustrate whether a fee is excessive to the funds and their investors:

- the quality of services provided to the fund and its investors;

- the nature of services being paid for by the fund and its investors;

- whether economies of scale were passed to the fund and its investors or kept by the investment adviser;

- whether the investment advisory fees are reduced to reflect the "fall-out benefits" the adviser receives, which are those benefits other than the advisory fees that flow to the adviser and its affiliates as a result of the adviser's relationship with the fund;

13

- what other fund families or funds within the same fund family charge
  for similar mutual funds; and

- whether the trustees exercised a sufficient level of care and
  conscientiousness in approving the investment advisory and
  distribution agreements and the fees contained therein.

An analysis of the 36(b) Funds shows that the Defendants charged excessive fees to benefit themselves.

### The Defendants' Profits Were Increasing During the Relevant Period

41.     The mutual fund industry is an enormously profitable industry, as it is for the Defendants.  In this regard, a Forbes article, published on September 15, 2003, stated as follows: "The average net profit at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall.  This increase in revenue was due to an increase in sales."  At a roundtable on investment company regulation by the Securities and Exchange Commission Historical Society, industry insiders made the following comments about the mutual fund industry's profits:

> MR. GOLDBERG: Well, a cynic might say that this is such an enormously profitable industry, you don't have to steal.

> MS. MCGRATH: Well, that's true. So much for 36(b).

The Roundtable on Investment Company Regulation, Securities and Exchange Commission Historical Society, Dec. 4, 2002 at 33.

42.     Managing the 36(b) Funds was also enormously profitable for Defendants.  From December 31, 2002 to December 31, 2003, the net income of the retail products group (a reportable segment of Hartford's "life" division that includes mutual funds) increased from $356 to $430 million, an increase of over 20%.  Hartford, annual report for the year ending December 31, 2004 (Form 10-K) (February 28, 2005) at 33.  From December 31, 2003 to December 31,

2004, the group's net income increased again from $430 to $526 million, an increase of over

22%. *Id.*

43.     As Hartford explained to its shareholders:

> Net income increased for the year ended December 31, 2004,
> principally driven by higher fee income from double digit growth
> in the assets under management in virtually all businesses of the
> segment and strong expense management…Another contributing
> factor to the increase in fee income was the increase in assets under
> management in the mutual fund and 401(k) businesses. Retail
> mutual fund assets under management increased 24% principally
> due to net sales and market appreciation of $2.5 billion each during
> 2004.

*Id.*

44.     Profits from managing the Hartford Funds continued to increase in 2005.[3]  From

December 31, 2003 to December 31, 2004 the net income of the retail products group increased

from $412 to $503 million, an increase of over 22%.  Hartford, annual report for the year ending

December 31, 2004 (Form 10-K) (Feb. 28, 2005) at 47.  From December 31, 2004 to December

31, 2005 the net income of the retail products group increased from $503 to $622 million, an

increase of over 23%.  *Id.*  Thus, the excessive fees charged by Defendants only served the

purpose of increasing Defendants' profits.  The rapidly increasing profits generated from

managing the Funds during the relevant period show that the incremental costs of managing the

Funds were nominal and the additional fees received by Defendants were highly disproportionate

given that the nature, quality, and level of services remained the same -- leading to a windfall for

Defendants.  For example, as described below, Defendants failed to pass on economies of scale

to the Funds or their investors.

---

[3]   Although in 2005, Hartford re-organized its reportable segments in its Life division such that the net income from
its retail segment (which continued to include profits from managing mutual funds) was restated back to 2003, even
under this new structure, Hartford still shows year-over-year increasing profits from the Funds. *See* Hartford, annual
report for the year ending December 31, 2004 (Form 10-K) (Feb. 28, 2005).

## Economies Of Scale Were Not Passed On To The Funds

45.     In theory, as a particular fund's total assets grow, the expenses borne by that fund

would be spread out and shared amongst fund investors, so that each investor's *pro rata* share of

the fund's expenses is correspondingly diminished. When these savings are not passed on to the

funds, excessive fees are, as was the case here, retained by the Investment Advisers and their

affiliates.

46.     The legislative history of Section 36(b) recognizes that an investment adviser's

failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale
> attributable to the dramatic growth of the mutual fund industry. In
> some instances these economies of scale have not been shared with
> investors. Recently there has been a desirable tendency of the part
> of some fund managers to reduce their effective charges as the
> fund grows in size. Accordingly, the best industry practice will
> provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), reprinted in 1970 U.S. Code Cong. & Ad. News, at 4901-02.

47.     On a per dollar of assets held basis it costs less to manage additional assets in a

growing fund because economies of scale occur on both the fund complex and portfolio level for

various costs incurred. As noted by the SEC in the Report of the SEC on the Public Policy

Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966):

> The economies of size, in large measure, reflect the fact that the
> management of both large and small security portfolios requires
> much the same general economic and market forecasting, analyses
> of various industry groups and evaluations of particular securities,
> since even a relatively small fund may be large enough to attain
> adequate diversification of investment risk. Indeed, in recent years
> there has been a tendency among many larger funds to decrease
> rather than increase the number of common stock holdings in their
> portfolios despite substantial growth through sales of fund shares.

48.     Significant economies of scale also exist with regard to the service and

administration fees charged to investors, which are also part of the expense ratio. The cost of

maintaining a shareholder's account is the same for all shareholders, regardless of the size of his or her account. Suppose the annual cost of maintaining an account is $40 and that the mutual fund has 100,000 shareholders. Under this scenario, if the fund has $100,000,000 in assets (an average of $1,000 per account), then the fund's administrative expenses are 4.0% of fund assets. If total assets are $250,000,000 (an average account of $2,500), then the administrative expense ratio is 1.6% because the expense ratio falls as fund assets rise. *See* David A. Latzko, *Economies of Scale in Mutual Fund Administration*, Penn. St. Univ., JOURNAL OF FINANCIAL RESEARCH, Sept. 22, 1999.

49.     The mutual fund industry is a business in which economies of scale are present and are statistically significant. *See* Jim Saxton, Chairman, Joint Economic Committee, United States Congress, *The Mutual Fund Industry: An Overview* (citing William Baumol, *The Economics of Mutual Fund Markets: Competition Versus Regulation*, 186, 190, Boston: Kluwer Academic (1990)). As explained by Lori Walsh, a financial economist for the SEC, "If the asset growth is successful, this should translate into a lower expense ratio and higher expected net returns, all other things equal." Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns*, available at http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.

50.     These considerable economies of scale that accompany the growth of assets under management by the Investment Adviser Defendants have benefited the Defendants greatly as the resulting cost savings have not been passed on to the 36(b) Funds and their investors through lower expense ratios. For example, as analysts observed about the Hartford Advisers Fund, "[e]ven if the fund's performance had been enticing, we'd still steer clear. Hartford has raised expenses as assets have increased, creating a 14% expense ratio that's higher than that of three fourths of category peers. An expensive fund with lackluster results doesn't cut it." Todd

17

Trubey, *Morningstar's Take: Hartford Advisers Fund keeps slipping,* March 31, 2004,

www.morningstar.com (password required). In another report, an analyst notes,

> "[y]et we're not convinced that this particular offering is the best
> way to play a large-cap resurgence, largely because of its outsized
> expense ratio. At 1.4%, the fund's annual levy is higher than that
> of any other front-load moderate-allocation fund with $1 billion or
> more in assets. Given that investors can readily obtain exposure to
> large-cap stocks and high quality bonds at a far lower cost, we'd
> recommend that they pass on this offering.

Christine Benz, *Morningstar's Take: Hartford Advisers has the making of an interesting*

*contrarian play, but we can't recommend it at its current price tag,* August 27, 2004,

www.morningstar.com (password required).

51.     The failure of the Investment Adviser Defendants to pass along the savings

generated from the growth of the 36(b) Funds is evidenced in each of the funds' annual and

semi-annual reports, which provide data regarding the total net assets of the fund and the ratio of

expenses to the net assets of the fund. Despite increases in assets in each of the 36(b) Funds, the

economies of scale created did not result in a corresponding decrease in the expense ratios of the

funds and, indeed, in several cases, the Investment Adviser Defendants inexplicably *increased*

fees.

52.     For example, between October 2000 and 2004, the Hartford Advisers Fund's

assets increased from $2.023 billion to $2.459 billion, an increase of over 21%.[4]  Over this same

period the fund's expense ratio for Class A shares *increased* from 1.21% in 2000 to 1.22% in

2004. Other Funds exhibited similar trends.

---

[4] Hartford Mutual Funds, annual report for the year ending October 31, 2002 (Form N-30D) (Jan. 2, 2003); Hartford
Mutual Funds, annual report for the year ending October 31, 2004 (Form N-CSR) (Jan. 7, 2005).

53.     Between October 1999 and October 2004, the Hartford Stock Fund's assets increased from $1.551 billion to $1.633 billion, an increase of 5.23%.[5]  Over this same period, the fund's expense ratio for Class A shares *increased* by 6.77%, from 1.33% in 1999 to 1.42% in 2004.

54.     Between October 2000 and October 2005, the Hartford Capital Appreciation Fund's assets *more than tripled,* increasing from $2.72 billion to $9.78 billion -- an increase of over 259%.[6]  Over this same period, the fund's expense ratio for Class A shares remained virtually unchanged, from 1.27% in 2000 to 1.26% in 2005.

55.     Between October 2001 and October 2004, the Hartford MidCap Fund's assets increased from $1.217 billion to $2.572 billion, an increase of over 111%.[7]  Over this same period, the fund's expense ratio for Class A shares remained virtually unchanged, from 1.38% in 2001 to 1.37% in 2004.

56.     Between October 2000 and April 2004, the Hartford Dividend and Growth Fund's assets increased from $500 million to $2.329 billion, an increase of over 365%.[8]  Over this same period, the fund's expense ratio for Class A shares remained virtually unchanged, from 1.31% in 2000 to 1.32% in 2004.

57.     Industry analysts have also made the following observations about the Hartford Dividend and Growth Fund. "As it is, the fund's high expenses consume much of the dividend income that its holdings throw off, explaining its below-average yield.  That's unacceptable in a

---

[5] Hartford Mutual Funds, annual report for the year ending October 31, 2000 (Form N-30D) (Dec. 20, 2000); Hartford Mutual Funds, annual report for the year ending October 31, 2004 (Form N-CSR) (Jan. 7, 2005).

[6] Hartford Mutual Funds, annual report for the year ending October 31, 2002 (Form N-CSR) (Jan. 2, 2003); Hartford Mutual Funds, annual report for the year ending October 31, 2004 (Form N-CSR) (Jan. 7, 2005).

[7] Hartford Mutual Funds, annual report for the year ending October 31, 2002 (Form N-30D) (Jan. 2, 2003); Hartford Mutual Funds, annual report for the year ending October 31, 2004 (Form N-CSR) (Jan. 7, 2005).

[8] Hartford Mutual Funds, annual report for the year ending October 31, 2002 (Form N-30D) (Jan. 2, 2003); Hartford Mutual Funds, semi-annual report for the period ending April 30, 2004 (Form N-CSRS) (July 9, 2004).

dividend focused fund like this one. We think investors should steer clear." Greg Carlson, *Morningstar's Take: We like this fund's Manager, but high expenses squelch its appeal*, Sept. 7, 2004, www.morningstar.com (password required).

58.     It becomes even more clear that the fees charged to the 36(b) Funds and their investors were excessive when looking at how much more the 36(b) Plaintiffs paid than investors paid in funds of comparable size. As evidenced above, the growth of the 36(b) Funds has not benefited these funds in the form of lower fees. This is further underscored by the fact that each of the 36(b) Funds' expense ratios is significantly higher than those of same-sized benchmark funds. For example, the chart below shows that, for 2003, Defendants charged up to 88 basis points more in fees to the 36(b) Funds than comparable funds, which due to their size should have similar costs and experience similar economies of scale.

### Comparison of 2003 Fees on Hartford Funds to CRSP[9]
### Value-Weighted Benchmark of Same Sized Funds
### All Share Classes
Differences in Terms of Basis Points ("BPs")[10]

| Fund Name | Strategic Objective | Amount by which fees exceed benchmark in BPs |
|---|---|---|
| Hartford Advisers Fund | Flexible Portfolio | 47 |
| Hartford Capital Appreciation Fund | Growth | 47 |
| Hartford Dividend and Growth Fund | Income Growth | 58 |
| Hartford Mid Cap Fund | Growth Midcap | 55 |
| Hartford Stock Fund | Growth and Income | 88 |

---

[9] Charts in this Complaint referring to the University of Chicago's Center for Research in Securities Prices ("CRSP") Benchmarks are the value weighted (weights obtained using the monthly asset valuation for each fund) average of all funds in the same size quartile that had the same CRSP Strategic Objective Designation. CRSP assigns each fund one of 187 Strategic Insight Fund Objective Codes based on its investment strategy. The results in this chart are for the A, B and C Classes of each Fund only, and are presented in terms of difference, defined as follows: Funds Expense Ratio Levels Minus Benchmark Expense Ratio Levels. Thus, a positive value denotes Fund expense ratios that are higher than industry benchmark averages. For example, fees for the Hartford Stock Fund exceed the CRSP Benchmark by 88 basis points.

[10] A basis point ("bp") is one-hundredth of a percentage point (0.01%). For example, 10 bps of $1 billion equals $1 million.

As illustrated above, Defendants failed to pass the benefits of economies of scale derived from

the growth of the 36(b) Funds on to their investors and instead kept the windfalls of such growth

to themselves.

### The Breakpoints In The Funds' Advisory Agreements Do Not Meaningfully Pass The Economies of Scale On To The 36(b) Funds And Are Largely Illusory

59.      A "fee breakpoint" has been explained as follows:

> Many funds employ a declining rate structure in which the
> percentage fee rate decreases in steps or at designated breakpoints
> as assets increase.... The declining rate schedule reflects the
> expectation that costs efficiencies or scale economies will be
> realized in the management and administration of the fund's
> portfolio and operations as the fund grows.

John P. Freeman and Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of*

*Interest*, U.S.C.L., http://www.law.sc.edu/freeman/jcl-01.pdf.

60.      While the advisory contracts for the 36(b) Funds include breakpoints, many of

these breakpoints were meaningless because, as a practical matter, they did not pass any of the

economies of scale to fund investors.  For example, Morningstar analysts noted that with regard

to the Hartford Dividend and Growth Fund:

> Why haven't expenses fallen more dramatically as assets have
> piled up? For one, there are no management fee breakpoints above
> $1 billion asset level, a curious thing given that Hartford ostensibly
> exerts the same effort overseeing the fund whether it's a $1 billion
> or $10 billion in size.  In addition, Wellington's pay schedule isn't
> as reasonable as it could be.  Bousa runs this fund in virtually the
> same style as his other charge, Vanguard Wellington.  Yet, this
> fund's pay schedule is significantly more generous (even after
> adjusting for the fact that a portion of the Vanguard fund is
> invested in bonds).  That strongly suggests that this fund's board
> ought to drive a harder bargain.

Greg Carlson, *Morningstar's Take: We like this fund's manager, but high expenses squelch its*

*appeal*, Sept. 7, 2004, www.morningstar.com (password required).  Indeed, the Hartford

Dividend and Growth Fund's last advisory fee breakpoint is at $1 billion, even though the fund

21

has not had under $1 billion in net assets since prior to 2002. Hartford Mutual Funds, annual report for the year ending October 31, 2005 (Form N-CSR) (Jan. 5, 2006). In fact, as of April 30, 2004, the fund had over $2.3 billion in net assets. Hartford Mutual Funds, semi-annual report for the period ending April 30, 2004 (Form N-CSRS) (July 7, 3004). Other 36(b) Funds had similarly ineffective breakpoints.

61.     The Hartford Midcap Fund's last advisory fee breakpoint is at $1 billion, even though the fund has not had under $1 billion in net assets since 2000 and has only continued to increase in assets since then. In fact, as of October 31, 2004, the fund had over $2.5 billion in net assets. Hartford Mutual Funds, annual report for the year ending October 31, 2005 (Form N-CSR) (Jan. 5, 2006).

62.     The Hartford Capital Appreciation Fund's last advisory fee breakpoint is at $1 billion, even though the fund has not had under $2 billion since prior to 2000. In fact, as of October 31, 2004, the Fund had over $7 billion in net assets. Hartford Mutual Funds, annual report for the year ending October 31, 2005 (Form N-CSR) (Jan. 5, 2006).

63.     The Hartford Advisers Fund's last breakpoint is at $1 billion, even though the fund has not had under $2 billion in net assets since prior to 2000. In fact, as of October 31, 2004, the fund had over $2.4 billion in net assets. Hartford Mutual Funds, annual report for the year ending October 31, 2005 (Form N-CSR) (Jan. 5, 2006).

64.     The manifest lack of effective breakpoints in these Funds demonstrates that the Investment Adviser Defendants had no intention of passing, and did not pass, any economies of scale to fund investors.

### The Fees Charged To The 36(b) Funds And Their Investors Were Excessive Relative To Similar Funds Offered In The Industry

65.     When examining the expense ratios of other fund families that provide the same types of funds as Hartford, it is apparent that the Investment Adviser Defendants charged higher

fees than other investment advisers who manage similar types of portfolios with similar

investment objectives. As the chart below illustrates, there was a pattern of overcharging in each

of the 36(b) Funds' expense ratios. The expense ratios for these funds' share classes exceeded

industry benchmarks by as much as 100 bps, which is statistically significant.

**Comparison of Hartford Funds Fees to the CRSP Benchmark**

**Benchmark is the Value-Weighted Average of All Funds
Existing During 2003 With the Same CRSP Strategic Objective
as the Hartford Funds**

**All Share Classes**
Differences in Terms of Basis Points

| Fund Name | Strategic Objective | BPs higher than benchmark |
|---|---|---|
| Hartford Advisers Fund | Flexible Portfolio | 56 |
| Hartford Capital Appreciation Fund | Growth | 53 |
| Hartford Dividend and Growth Fund | Income Growth | 67 |
| Hartford MidCap Fund | Growth Midcap | 60 |
| Hartford Stock Fund | Growth and Income | 100 |

66. Analysts have also observed Defendants' overpricing of the 36(b) Funds. For

example, regarding the Hartford Advisers Fund an analyst observed that,

> "[T]he fund has another looming issue: a rising annual expense
> ratio. Earlier in 2003, Hartford raised its fees here from 1.22% to
> 1.36%. That might not sound like a lot, but consider that it's an
> 11% price hike in a noninflationary environment. To add further
> context, among more than 170 asset allocation funds with front-
> end load, this fund ranks tenth in assets under management, yet its
> current expense ratio is much higher than the group average…Also
> note that assets here have actually grown over the past few years,
> so expenses should be going down, not up."

Brian Portnoy, *Morningstar's Take: Higher expenses might roil Hartford Advisers*, October 27,

2003, www.morningstar.com (password required).

67. With regard to Hartford Dividend and Growth Fund, analysts have noted that,

"[w]e are worried, however, that the fund's rather high expense ratio gobbles up too much of its

dividends. Only one front-loaded large-value fund with more than $2 billion in assets has a

higher cost than this fund's 1.41% expense ratio. (Hartford raised expenses even as the fund's assets increased in 2003.)" Todd Trubey, *Morningstar's Take: We don't think Hartford Dividend & Growth's costs allow its strategy to work well*, April 8, 2004, www.morningstar.com (password required).

68.     The foregoing chart and analysts' comments illustrate that the 36(b) Funds' expense ratios were far beyond the expense ratios of similar funds in the industry.

## The Nature and Quality of Services Do Not Justify The Excessive Fees

69.     The nature and quality of advisory services provided to the Funds do not justify the excessive expense ratios carried by the Funds. Defendants cannot justify their high fees by arguing that their managers and analysts are of superior quality and provide superior performance. The performance of the 36(b) Funds was not up to par with other similar funds in the industry and thus could not justify the higher fees. For example, as illustrated in the chart below, during the relevant period, overall, the 36(b) Funds underperformed relative to a weighted average of benchmark funds with the same CRSP Strategic Objective as each of the Funds.

Comparison of Cumulative Excess Returns on Hartford Funds
Relative to Benchmarks - All Class Shares
February 2003 Through February 2004
Benchmark Funds May Have Loads
Cumulative Returns on the 36(b) Funds Compared to Benchmark

| Fund Name | % Return Net Expenses | % Return Net Expenses & Loads |
|---|---|---|
| Hartford Advisers Fund | -4.34 | -4.55 |
| Hartford Dividend and Growth Fund | -2.76 | -2.69 |
| Hartford Mid Cap Fund | -3.10 | -3.60 |
| Hartford Stock Fund | -6.20 | -6.37 |

Therefore, the quality of services, as measured by the performance of the funds compared to similar funds, fails to justify the excessive expense ratios charged to the 36(b) Funds and their investors by Defendants.

70.     In fact, part of the reason the 36(b) Funds underperformed is that the high fees charged by Defendants consumed any gains. According to one Morningstar analyst, Hartford

Dividend & Growth Fund's performance did not justify the excessive fees charged to the fund, with the fund's performance being close to the bottom quartile in the relevant period. Todd Trubey, *Morningstar's Take: We don't think Hartford Dividend & Growth's costs allow its strategy to work well*, April 8, 2004, www.morningstar.com (password required). In 2004, the fund was lagging behind 86% of its peers. *Id.* The analyst notes, "We are worried, however, that the fund's rather high expense ratio gobbles up too much of its dividends … Because dividends first pay a fund's expense ratio, this one sports a middling 0.76% trailing 12 month yield. For comparison's sake, four funds from American Funds double that yield, partially because their expense ratios are less than half as high." *Id.*

71.     With regard to Hartford Advisers Fund, a Morningstar analyst noted, "[l]ow costs are a key determinant of success in this tightly competitive category. We expect this fund's talented managers to capably deliver through a full market cycle, but that won't mean as much if they continue to labor under the burden of higher fees." Brian Portnoy, *Morningstar's Take: Higher Expenses might roil Hartford Advisers*, October 27, 2003, www.morningstar.com (password required).

## THE FEES CHARGED WERE NOT REASONABLY RELATED TO SERVICES PROVIDED TO THE HARTFORD FUNDS AND THEIR INVESTORS

### The Defendants Placed The Expense Of Revenue Sharing Payments On The 36(b) Funds And Their Investors

72.     The Investment Adviser and Distributor Defendants also charged excessive fees by charging the 36(b) Funds and their investors for such Defendants' out-of-pocket revenue sharing expenses. Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold. *See* Smita Madhur, *Revenue Sharing Boosts Mutual Fund Sales Tenfold*, Financial-Planning.com, Jan. 24, 2005, http://www.financial-planning.com/pubs/fpi/20050124101.htm.

73.     At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and excessive fees levied upon shareholders.

74.     These payments increased the fees levied on the Funds and their investors because the Investment Adviser Defendants, in determining the amount they would charge for their advisory fees, accounted for the costs of the revenue sharing agreements for which they paid broker-dealers and others, in order to ensure the recovery of their full profit after the revenue sharing payments were made.

75.     A recent report on revenue sharing by Cerulli Associates notes that advisory fees are the most significant source of revenue sharing. *See* Cerulli Associates, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* (2005). The advisory fee can be inflated in order to finance the adviser's revenue sharing obligations and, as shown herein, the Investment Adviser Defendants did just this with respect to the Hartford Funds.

76.     Investment advisory fees are meant to cover management of the invested funds. This includes management and administrative activities related to managing the fund's portfolios. Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966).

77.     The investment advisory fees used for revenue sharing do not fit either of these categories. Revenue sharing expenses are not supposed to be borne by funds and their investors as they are not management or traditional advisory expenses. Furthermore, the revenue sharing payments may benefit the Investment Adviser Defendants, but do not benefit the Funds or their investors.

78.     Here, Defendants participated in revenue sharing relationships with 73 broker-dealers. SEC Hartford Order at *6. Specifically, Defendants had a strong relationship with Edward Jones, who required Investment Adviser companies, such as Hartford, to pay 25% of the

advisory fees for assets purchased or sold. *In the Matter of Edward D. Jones and Co., L.P.*, at paragraph 5 (Dec. 22, 2004) *available at* http://sec.gov/ litigation/admin/33-8526.htm. That such a significant portion of the Funds' advisory fees were being used to pay for relationships that do not benefit the funds' investors, clearly illustrates that Defendants' fees were not related to the services provided.

79.     According to Morningstar, "[o]f the seven families, Hartford pays by far the most for this preferential treatment. While the American Funds pay $3.27 per $10,000 of assets invested with Edward Jones, the Hartford pays more than $20...the amount that Hartford pays is by far the highest we know of ... All told, in 2004, the Hartford paid $18 million to Edward Jones." Morningstar Stewardship Grade: Hartford Advisers A, Nov. 29, 2005, www.morningstar.com (password required).

80.     The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds. Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees." Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.R.F. pts. 239, 240 and 274).

81.     The nature of Defendants' revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts in order to increase the size of the

Funds. As a result of such activities, the aggregate net assets—against which the management fees were charged on a percentage basis—increased, with a consequent increase in the dollar amount of the advisory fees. The Investment Adviser Defendants therefore received "something for nothing" from the Funds and their investors because the fees were not the result of any increase or improvement in the services being provided, and did not reflect any legitimate increase in the cost of the services being provided to the advisers and their affiliates.

82.    In addition, the advisory fee payments made by the Funds and their investors that were utilized for revenue sharing were charged in violation of Rule 12b-1. Advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, are regulated under Rule 12b-1 and Section 36(b). As the SEC explained, "Rule 12b-1 could apply [. . .] in certain cases in which the adviser makes distribution related payments out of its own resources . . . 'if any allowance were made in the investment adviser's fee to provide money to finance distribution.'" Investment Company Institute, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing Payment of Asset-Based Sales Loads By Registered Open-End Management Investment Companies, ICA Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)). Defendants paid for part of these revenue sharing arrangements through advisory fees to circumvent limits placed on such distribution payments by Rule 12b-1.

### Defendants Received Massive 12b-1 Fees But Provided No Benefit To The Hartford Funds Or Their Investors In Return

83.    As discussed above, Rule 12b-1, promulgated by the SEC pursuant to the ICA, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions are, amongst others, that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution and that all agreements

with any person relating to implementation of the plan are in writing;" the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." 17 C.F.R. § 270.12b-1.  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).  The directors may continue the plan "only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and sections 36(a) and (b) (15 U.S.C. 80a-35(a) and (b)) of the Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).  As noted above, Rule 12b-1 fees are assessed as a percentage of assets under management and, accordingly, grow proportionately with the size of the Funds.

84.    The Distributor Defendants, as affiliates of the Investment Adviser Defendants, were similarly obligated by their fiduciary duty to the Funds and their investors with respect to the fees they received. The Distributor Defendants were the recipients of 12b-1 fees, but took no measures to assure that the fees were reasonably related to the services provided to the Funds or their investors.

85.    Additionally, the 12b-1 fees charged to the 36(b) Funds and their investors were all higher than those charged by comparable funds. As illustrated below, Defendants charged 12b-1 fees to each of the funds that were significantly higher than comparable funds:

**Comparison of Hartford Funds 12b-1 Fees to the CRSP Benchmark**
**Benchmark is the Value-Weighted Average of All Funds**
**Existing During 2003 with the Same CRSP Strategic Objective**
**as the Hartford Funds**

**All Share Classes**
Differences in Terms of Basis Points

| Fund Name | Strategic Objective | Amount by which 12b-1 fees exceed benchmark (bps) |
|---|---|---|
| Hartford Advisers Fund | Flexible Portfolio | 36 |
| Hartford Capital Appreciation Fund | Growth | 36 |
| Hartford Dividend and Growth Fund | Income Growth | 33 |
| Hartford MidCap Fund | Growth Midcap | 39 |
| Hartford Stock Fund | Growth and Income | 43 |

## The Investment Adviser and Distributor Defendants Failed to Reduce Their Fees to Reflect The Fall-Out Benefits They Received From Directing Brokerage to Cover Their Out-of-Pocket Expenses

86.     Directed brokerage is a practice which directly harms investors, especially where, as here, the fund is alleged to be "paying up," or trading securities at commission rates higher than the fund would otherwise pay if it were not indirectly paying for distribution through directed brokerage. Directed brokerage gives the investment adviser a strong incentive to use brokerage commissions to increase the size of its funds (thereby increasing management/advisory fees) and to avoid paying brokers out of its own assets.

87.     By shifting their expenses to the Funds and their investors, the Investment Adviser and Distributor Defendants were able to increase their own revenues at the expense of investors. These Defendants should have reduced their advisory and 12b-1 fees to reflect the benefits they received from the use of brokerage commissions to satisfy revenue sharing arrangements. However, Defendants' failure to reduce their fees to reflect their use of fund assets resulted in their receipt of excessive advisory and 12b-1 fees.

88.     On November 8, 2006, the SEC fined Hartford for its directed brokerage

activities, stating:

> [HIFSCO] and HL Advisors benefited from these special benefits
> because an increase in sales of Funds resulted in an increase in the
> investment management fee [HIFSCO] and HL Advisors received.
> Likewise, as the Funds' distributors and underwriters, Hartford
> Investment and Hartford Distribution benefited because as sales of
> the Retail and HLS Funds increased, so did the amount of sales
> charges they received.
>
> ***
>
> Hartford Investment and Hartford Distribution often used the
> brokerage commissions generated by the Retail and HLS Funds
> portfolio transactions, which are assets of the Funds and their
> shareholders, to meet their financial obligations under the shelf
> space arrangements.
>
> Hartford Investment and Hartford Distribution treated the shelf
> space arrangements as payment obligations....
>
> In fact, each year Hartford Investment and Hartford Distribution
> calculated their financial obligations to certain broker-dealers
> under the negotiated shelf space arrangements that Hartford
> Investment and Hartford Distribution had with these broker-dealers
> and directed the Funds' brokerage commissions to meet their
> obligations under those arrangements.

SEC Hartford Order at *7-9, 12-13.

89.     In addition to corroding the broker-investor relationship, Defendants' use of

directed brokerage commissions decreased the transparency of the Funds' and investors' costs.

Monies spent through directed brokerage do not show up as expenses, but are merely reflected as

a decrease in investors' returns. The opaqueness of this form of payment also allowed the

Investment Adviser and Distributor Defendants to circumvent the limits placed by the NASD on

12b-1 fees.

31

90.     By paying the excessive commissions and directing brokerage business, the

Investment Adviser and Distributor Defendants violated Section 12 of the ICA, because such

payments were not made pursuant to a valid Rule 12b-1 plan.

91.     The excessive commissions and directed brokerage practices caused the 36(b)

Funds' investors to pay for services that did not benefit the funds or their investors.  In fact, the

Investment Adviser Defendants and their affiliates profited from the use of fund and investor

assets because it resulted in an increase in the size of the funds and, thus, the size of their asset-

based fees.  This increase in fees bore no reasonable relation to the services rendered.

### Through Their "Soft Dollar" Program, The Investment Adviser Defendants Shifted Overhead Costs To The 36(b) Funds And Their Investors Without Providing Any Offset In Their Advisory Fees for these Fall-Out Benefits

92.     The Investment Adviser Defendants received significant benefits by using "Soft

Dollars," as defined below, to shift research costs onto investors through inflated broker

commissions, while failing to reduce their advisory fees to reflect this benefit.

93.     Investment advisers routinely pay broker commissions on the purchase and sale of

fund securities, and such commissions may, under certain circumstances, properly be used to

purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe

harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires

investment management companies to obtain the best possible execution price for their trades.

Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary

duties "solely by reason of [their] having caused the account to pay a ... broker ... in excess of

the amount of commission another . . . broker . . . would have charged for effecting that

transaction, if such person determined *in good faith* that such amount of commission was

reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §

78bb(e)(1).  In other words, funds are allowed to include in "commissions" payment for not only

purchase and sales execution, but also for specified services, which the SEC has defined to include any service that "provides lawful and appropriate assistance to [the] money manager in performance of his investment decision-making responsibilities." *Id.*, Interpretative Notes and Decisions 7 (citation omitted). The commission amounts charged by brokerages to investment advisers in excess of the purchase and sales charges are known within the industry as "Soft Dollars."

94.     The Investment Adviser Defendants paid excessive commissions to broker-dealers, which, insofar as they were transferred under the guise of Soft Dollars, were a sham and unjustifiable in light of the Investment Adviser Defendants' in-house research apparatus, for which the Funds and their investors were already paying through the advisory fee. Instead, the purpose of these payments was to induce the brokers to steer their clients to the Hartford Funds. These incentives caused brokers to steer clients to the Funds regardless of the Funds' investment quality relative to other investment alternatives. By paying the excessive brokerage commissions, Defendants also violated Section 12(b) of the ICA because such payments were not made pursuant to valid Rule 12b-1 plans.

95.     According to Nelson Information's Directory of Investment Managers (14th Ed. 2001) (the "Nelson Directory"), Hartford is "a premier provider of insurance and asset management products. Hartford Investment Management Company [HIMCO] is the longstanding fixed income provider of choice for The Hartford and its clients." HIMCO manages "assets by using a disciplined, modified top-down process which is designed to create value from each of three steps: controlled duration management, sector allocation and security selection." *Id.* at 2209.

96.     Consistent with this philosophy, the Nelson Directory, for the relevant years, states that Hartford's research sources are **100% in-house** research. *Id.* Based on Hartford's

own proprietary research apparatus, there is demonstrably little need for reliance on outside research.

97.     The Directors did not have adequate information to measure the value to the Funds and their investors of the Soft Dollars generated. However, the amount paid by the Funds and their investors for excessive commissions was significant and the advisory fee was not reduced to reflect the benefits received by the Investment Adviser Defendants, who utilized Fund assets in the form of Soft Dollars to pay for research that was already being paid for through the advisory fee. Accordingly, the fees paid by the Funds and their investors through so-called "Soft Dollar" payments were excessive and bore no reasonable relationship to the services provided. Such fees resulted in the promotion by brokers of the Hartford Funds, thereby increasing the size of the Funds and Defendants' asset-based fees with no corresponding increase in services provided to the Funds or their investors.

## The Directors' Failure To Act Independently And Conscientiously Resulted In Defendants Charging Excessive Fees To The 36(b) Funds And Their Investors

98.     Mutual funds are typically created and managed by investment advisers for a profit. Investment advisers usually supervise a mutual fund's daily operations, and often select affiliated persons to serve on the Board of Directors. As former SEC Commissioner Manuel Cohen remarked when referring to testimony by investment advisers:

> They also made the point that the investment adviser creates the fund, and operates it in effect as a business. Many of them stated that "*It is our fund, we run it, we manage it, we control it,*" and I don't think there is anything wrong with them saying it. They were just admitting what is a fact of life. The investment adviser does control the fund.

*Statement of Manuel Cohen, Commissioner, SEC, Investment Company Act Amendments of 1976: Hearings on H.R. 9510*, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce (1967) (emphasis added).

34

99.     As a result of the investment advisers' control of the fund, the relationship

between investment advisers and mutual funds contains many potential conflicts of interest. This

conflict arises because part of the fees the investment advisers charge, which reduce investors'

returns, represents revenue and a source of profit to the investment adviser. *See* GAO Report,

*Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition* ("GAO Report"),

at 14, 82, available at http://www.gao.gov/new.items/gg00126.pdf.

100.     The ICA was enacted in response to concerns that mutual fund shareholders were

not being adequately protected as a result of these conflicts of interest. As a result, the Directors

were made responsible for overseeing the investment advisers' activities. GAO Report at 14.

More specifically, the ICA requires the presence of independent directors on the Board of

Directors to review and approve the fees the Funds and their investors are charged. *See* 15

U.S.C. § 80a-10(a). The Board of Directors is responsible for approving the investment advisory

agreements, 12b-1 plans, and fees paid to Defendants. In reviewing and approving the

foregoing, the Directors are required to act in the best interest of the investors.

101.     Acting in the investors' best interests requires the Directors to exercise due care in

approving the fees charged to those funds that the Directors have the responsibility to oversee.

Accordingly, when evaluating whether there is a violation of 36(b), with regard to the board of

directors, courts consider that:

> the expertise of the independent trustees of a fund, whether they
> are fully informed about all facts bearing on the adviser-manager's
> service and fee, and the extent of care and conscientiousness with
> which they perform their duties [are] important factors to be
> considered in deciding whether they and the adviser-manager are
> guilty of a breach of fiduciary duty in violation of 36(b).

*Gartenberg v. Merrill Lynch Asset Mgmt, Inc.*, 694 F.2d 923, 930 (2d Cir. 1982).

102.     Here, the "independent" directors of the 36(b) Funds do not meet any of these

criteria. First, the Board of Directors were not fully informed about facts bearing on the

35