Investment Adviser Defendants' fees. For example, the Hartford Funds' Directors did not discover that the Funds' assets were being used to satisfy the Investment Adviser Defendants' revenue sharing commitments through directed brokerage. As the SEC concluded:

> the Boards were not aware of and did not authorize [HIFSCO and Hartford Securities'] use of directed brokerage to satisfy their financial obligations under their shelf space arrangements. Furthermore, [HIFSCO] and HL Advisors **deprived the Boards of the opportunity to exercise their independent judgment to decide how to use fund assets in accordance with the best interests of the Retail and HLS Funds' shareholders.**

SEC Hartford Order at *16 (emphasis added). Without knowing that the Investment Advisers were using the 36(b) Funds' assets to satisfy their revenue sharing commitments, the directors could not be "fully informed" and thus could not act in the best interests of investors when negotiating the various fees paid by the 36(b) Funds.

103. Similarly, the Funds Directors' approval of investment advisory contracts between the 36(b) Funds and the Investment Adviser Defendants should be given no weight because the Directors did not have information sufficient properly to evaluate the fairness of the fees being charged.

104. HIFSCO's failure to disclose information about directed brokerage to the board was so complete that the SEC held that HIFSCO was in violation of § 206(2) of the Investment Advisers Act of 1940 which "prohibits an investment adviser from engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client."

105. Moreover, the Directors failed to recognize that since brokerage commissions are Fund assets, they should have been reflected in a 12b-1 plan. This failure to act prejudiced the Funds and their investors and resulted in the Funds and their investors paying excessive distribution fees.

106.    By withholding information from the 36(b) Funds' Directors about how the fund investors' assets were being used to satisfy their revenue sharing obligations, despite a duty to do so, the Investment Adviser Defendants denied the Directors the ability to conscientiously evaluate the 36(b) Funds' fees. *See* SEC Hartford Order at \*15-17.

107.    Second, the Board of Directors did not act independently when approving the Investment Advisers Defendants' fees. In determining whether or not a Director is considered an "interested person," the ICA states that "a natural person shall be presumed not to be a controlled person." 15 U.S.C. § 80a-2(a)(9). The term "interested person" is defined to include "any affiliated person" of an investment company, investment adviser, or principal underwriter. *Id.* at § 80a-2(a)(19)(A)(i), (B)(i). "Affiliated person" is further defined as "any person directly or indirectly controlling, controlled by, or under common control with, such other person." *Id.* at § 80a-2(a)(3)(C) (emphasis added). Finally, the ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company." *Id.* at § 80a-2(a)(9).

108.    The presumption that a Director is not a "controlled person" under the ICA may be rebutted by "evidence." 15 U.S.C. § 80a-2(a)(9). Such evidence may include allegations that non-employee directors followed a course of action suggested by the investment advisers which prejudiced the funds' shareholders. If the Directors rubber stamp suggestions of the investment advisers, they cannot fulfill their statutory duties to act as "watchdogs" for the Funds.

109.    The purportedly "non-interested" Directors who served on the Board of Directors of the 36(b) Funds during the relevant period include: Winifred E. Coleman, William A. O'Neill, Millard H. Prior, Jr., John K. Springer, Robert M. Gavin, Duane E. Hill, Lynn S. Birdsong, and Phillip O. Peterson.

110.    These purportedly "non-interested" Directors routinely followed the Investment Adviser Defendants' suggested courses of action by rubber stamping fees and arrangements

which prejudiced the Funds' investors. Specifically, the Directors failed to genuinely consider and recognize that managing the Hartford Funds was incredibly profitable for the Investment Adviser Defendants and therefore management fees should be reduced (*see supra* ¶¶ 41-44); that no economies of scale were passed to the 36(b) Funds or their investors as the funds grew (*see supra* ¶¶ 45-58); that breakpoints offered to the 36(b) Funds were illusory (*see supra* ¶¶ 59-64); that the fees were significantly more expensive than comparable funds (*see supra* ¶¶ 65-68); that the 36(b) Funds were underperforming relative to comparable funds (*see supra* ¶¶ 69-71); that the 36(b) Funds were being charged significantly higher 12b-1 fees than comparable funds without receiving any benefits (*see supra* ¶¶ 83-85); and that the advisory fees should be reduced to reflect the "fall-out" benefits received by Defendants (*see supra* ¶¶ 86-97).

111.    The SEC has made clear that it is the duty of the Directors to scrutinize carefully the advisory and other fees to ensure that the economies of scale are being passed to investors as fund assets grow so that the increases in advisory and other fees are not a windfall to the investment advisers and their affiliates:

> If the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract. If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC Division of Investment Management: *Report on Mutual Fund Fees and Expenses available at*: http://www.sec.gov/news/studies/feestudy.htm. (Dec. 2006).

112.    In addition, in order for the Directors to fulfill their responsibilities regarding the charging of Rule 12b-1 fees, the Directors must understand the funds' distribution system as a whole so that the 12b-1 fees can be placed in the appropriate context. To do this, the Directors

must understand what the primary distribution channels are, what the funds and the advisers are paying to use these channels, whether the distribution efforts are succeeding, and whether there are resulting economies of scale which benefit the investors. The Directors failed to obtain this necessary information, and their failure to do so prejudiced the 36(b) Funds and their investors.

113.    While the 36(b) Funds' assets were used to encourage the growth of the funds, the funds received no benefits in return. The Directors continually allowed the 36(b) Funds' assets to be used for only the benefit of the Investment Adviser Defendants and their affiliates. As purportedly "independent" Directors, they had a duty to question the Investment Adviser Defendants' and their affiliates' practices, and to ensure that any economies of scale that were being realized from the increase in the funds' assets were being passed on to the funds. The Directors' approval of such actions, which prejudiced the funds and their investors, further demonstrates that they were controlled by the Investment Adviser Defendants. In particular, it is inconceivable that the Directors could have been acting independently or conscientiously when they approved the illusory breakpoints in the 36(b) Funds' advisory fees -- these clearly ineffective breakpoints were "red flags" that economies of scale were not being passed on to funds.

114.    The SEC has set forth several additional factors relevant to a determination of whether the presumption that the Directors are not "controlled" persons under the ICA may be rebutted. These factors include, *inter alia*, the Directors' "independent knowledge of corporate affairs." *See* First Australia Fund, Inc. SEC No-Action Letter, 1987 WL 108483 (S.E.C.), at *7 (Oct. 8, 1987). Here, as the SEC has concluded, the abuse of Hartford Fund assets through directed brokerage by the Investment Adviser Defendants was kept from the Funds' Board of Directors. *See* SEC Hartford Order at *16-17 ("…the Boards were not aware of and did not authorize [HIFSCO and Hartford Securities'] use of directed brokerage…"). By controlling the

scope of information available to the Board of Directors, the Investment Adviser Defendants were able to indirectly control the board. Without knowing that fund assets were being used to satisfy revenue sharing commitments made by the Investment Adviser Defendants, or even knowing about such commitments, the Directors could not act in a truly independent manner when approving the fees charged by the Investment Adviser Defendants to the 36(b) Funds, and therefore such approval should be given no weight when evaluating whether such fees were excessive.

115.    As explained by Paul Roye, Director, Division of Investment Management of the

U.S. Securities & Exchange Commission:

> Independence in my view is how you analyze and approach the
> issues before you. Is your central consideration what's in the
> shareholder's best interest? If so, you are functioning
> independently. While you need not be antagonistic toward
> management of the fund, you need to recognize that management's
> interests aren't always aligned with the shareholders of the fund
> and sometimes constructive skepticism is called for. The
> regulatory framework and the nature of the mutual fund business,
> creates a healthy tension between a fund's management and the
> independent directors. Sometimes it is necessary to probe and
> challenge to identify potential areas of concern before they become
> significant problems.

Speech by SEC Staff: *What Does It Take To Be an Effective Independent Director of a Mutual
Fund?* (Apr. 14, 2000), *available at* http://www.sec.gov/news/speech/spch364.htm (emphasis
added). As indicated, if the Directors were in fact acting independently, they would have
performed at least a minimal amount of constructive skepticism, or probed into the issues that are
alleged herein. "[D]espite th[e] congressionally mandated 'watchdog' role, trustees have
acquiesced too readily to the demands of fund management companies, failing to ... [*inter alia*]
question excessive fees. . . ." Julie Hembrock Daum and Richard Lannamann, *Rising
Expectations: Mutual fund directors called to create a culture of independence*, June 2004,
available at http://www.spencerstuart.com/research/boards/679/.

116.    Third, as indicated by the Second Circuit in *Gartenberg*, the expertise of the "non-interested" directors of a fund is also a factor to be considered. *Gartenberg*, 694 F.2d at 930. The mutual fund industry and its distribution and fee structures are not simple to understand. For this reason, it is critical that the Directors responsible for overseeing the fee agreements of a fund have experience in the mutual fund arena.

117.    These Directors' backgrounds illustrate that most of them lacked the financial experience necessary to understand the different mutual fund fee structures and adequately represent shareholders. Of the seven purportedly "non-interested" directors serving during the relevant period, only two, Lynn Birdsong and Philip Peterson, have disclosed any previous experience with mutual funds. Birdsong was formerly managing director of Zurich Scudder Investments, an investment management firm, and Peterson was a mutual fund industry consultant. This lack of experience prejudiced the Funds and their investors, as the Directors were consequently unable to carefully evaluate the fees charged to the 36(b) Funds or detect and prevent the unauthorized use of directed brokerage. *See* The Hartford Mutual Funds Inc., annual report for the fiscal year ending October 31, 2004 (Form N-CSR) (Jan. 7, 2005).

118.    Finally, the board of directors for the Hartford Funds could also not approve the fees charged to the funds in a careful and conscientious manner given the massive number of Funds each was responsible for overseeing. Each of the Funds in the Hartford complex shares the same board of directors. As such, each of the seven purportedly "independent" directors serving during the relevant period, with the exception of John K. Springer, was charged with overseeing a minimum of 72 portfolios in the Hartford Fund complex. Hartford Mutual Funds, annual report for the year ending October 31, 2003 (Form N-CSR) (Jan. 9, 2004). John K. Springer, before his retirement in May 2003, oversaw 75 portfolios in the Fund complex. Hartford Mutual Funds, annual report for the year ending October 31, 2002 (Form N-30D) (Jan.

2, 2003). The manifest inability of the directors to engage in the required fund-by-fund analysis

when reviewing the 36(b) Funds' fees is borne out by the finding that an average independent

director oversees merely 18.54 funds (in fact, the median is 6 funds). Ferris, Stephen P. and

Yan, Xuemin Sterling, *Do Independent Directors and Chairmen Really Matter? The Role of*

*Boards of Directors in Mutual Fund Governance* (February 2005), at 23, 27. Available at

http://ssrn.com/abstract=681526. Here, each Director sits on the Board of over 72 Hartford

Funds.

119.    Industry analysts agree that the Directors cannot adequately oversee this many

funds. Morningstar gave Hartford's board its third-lowest grade for the board's performance in

2006: "**[w]e also think that the board members are spread far too thin to be effective**. Most

directors are responsible for 76 funds, and the other two cover more than 50." *Morningstar*

*Stewardship Grade: Hartford Capital Appreciation A* , Sept. 12, 2005, www.morningstar.com

(password required) (emphasis added).[11]

120.    By overseeing so many funds, the Directors manifestly failed to devote adequate

time to analyzing the fees paid on the required fund-by-fund basis and relied on the Investment

Adviser Defendants to set the fees and essentially rubber-stamped them.

## DEFENDANTS' REVENUE SHARING AND OTHER PRACTICES
## WERE OMITTED FROM THE FUNDS' PROSPECTUSES AND SAIS

121.    Unbeknownst to Plaintiffs and other members of the Class, Hartford used the

assets of its mutual fund investors to pay brokerages to push Hartford mutual funds aggressively

---

[11] The excessive number of funds overseen by the Directors is particularly alarming in light of a recent study that determined that the number of mutual funds a director oversees is positively correlated with both a higher expense ratio and a greater likelihood of the mutual fund engaging in a scandal. Ferris, Stephen P. and Yan, Xuemin Sterling, *Do Independent Directors and Chairmen Really Matter? The Role of Boards of Directors in Mutual Fund Governance* (Feb. 2005), at 23, 27. Available at http://ssrn.com/abstract=681526.

on unwitting investors through "shelf-space programs" without adequately disclosing such practices in the Funds' prospectuses and Statements of Additional Information ("SAIs").

### Hartford Engaged in Revenue Sharing and Directed Brokerage to Acquire "Shelf-Space" at Brokerages

122.    Unbeknownst to Plaintiffs and the other members of the Class, Hartford used the assets of its mutual fund investors to pay kickbacks to various brokerage houses, including, but not limited to, Edward Jones, Wachovia Securities, Salomon Smith Barney, A.G. Edwards, UBS Financial Services Inc. and Merrill Lynch, in exchange for these brokerage houses pushing their unwitting clients into Hartford Funds. These *quid pro quo* payments in exchange for "shelf-space" were nothing more than a series of veiled payments by Defendants to have brokers steer unknowing investors into Hartford funds. These payments were omitted from the Prospectuses and SAIs.

123.    For example, according to internal documents from the Class Period and a former Vice-President employed by one of Hartford's Investment Advisers during the Class Period, Hartford had "shelf-space" agreements with numerous brokerage houses during the Class Period. As explained below, the payments for these *quid pro quo* arrangements with brokerage houses came in the form of "directed brokerage," "revenue-sharing payments," and "soft dollars."

124.    These "shelf-space" arrangements also resulted in inflated fees charged to investors. As stated in the March 1, 2003 Hartford Advisers Fund prospectus, which is identical in substance to all prospectuses issued during the Class Period, these fees, which include management and 12b-1 fees, are "paid directly from your [the shareholders'] investment." These fees were assessed directly against shareholders and immediately affected the current redemption value of their shares.

125.    Throughout the Class Period, Edward Jones, Salomon Smith Barney and other brokerages reportedly received approximately $100 million per year for pushing Hartford and

other "shelf space" funds. The effect of these payments is evidenced by the fact that these funds constituted approximately 90% to 95% of the overall fund sales during the Class Period of brokerages such as Edward Jones and Salomon Smith Barney.

126.    From at least January 2000 through December 2003, the Investment Adviser Defendants and their affiliates negotiated and entered into revenue sharing agreements with 73 broker-dealers as a *quid pro quo* for special marketing and distribution benefits for Hartford Funds. SEC Hartford Order at *6.

127.    On January 9, 2004, *The Wall Street Journal* exposed the "shelf-space" relationship between Hartford and brokerages such as Edward Jones, explaining that Hartford paid Edward Jones substantial amounts to favor Hartford Funds when pitching funds to customers. In the article, *The Wall Street Journal* detailed the wrongdoing based on an investigation that included interviews with former and current brokers with knowledge of the practice.

### Directed Brokerage

128.    Defendants used directed brokerage as one method of kickback payment, whereby Defendants promised and sent brokerage business on the trades of securities in the Hartford Funds to satisfy their *quid pro quo* "shelf-space" arrangements with brokerages. Between January 2000 and December 2003 alone, HIFSCO and its affiliates instructed their subadviser "to direct brokerage commissions totaling $51 million to broker-dealers to satisfy [HIFSCO's and its affiliates'] *quid pro quo* shelf space obligations." SEC Hartford Order at *12-13.

129.    According to internal Hartford documents from the Class Period as well as the former Vice-President for one of the Investment Adviser Defendants referenced in ¶ 123, Hartford's payment for "shelf-space" would be in the form of directed brokerage to allow the brokerage houses to receive commissions for executing transactions on behalf of the Hartford

Funds. Accordingly, Hartford Funds traders were not able to get trades done at the best execution price, because they were under orders to direct commissions to specifically earmarked brokerage houses.

130.    Also according to internal Hartford documents from the Class Period,  Hartford circulated monthly reports during the Class Period that stated the amount of directed brokerage Hartford had committed in exchange for the *quid pro quo* "shelf-space" programs.  These reports listed dozens of brokerage houses, such as AG Edwards, Merrill Lynch, Wachovia and Edward Jones, and detailed the millions of dollars paid to these brokerage houses in directed brokerage during the Class Period.

131.    In actions to date against Morgan Stanley DW, Inc., Massachusetts Financial Services, Inc., Fleet Investment Advisors, Inc., Franklin Advisers, Inc., Deutsche Investment Management Americas, Inc., PA Fund Management LLC, OppenheimerFunds, Inc., *and Defendants themselves,* the SEC and NASD have condemned these practices, finding that they violate the federal securities laws as well as the rules of the NASD.

## Revenue Sharing

132.    According to internal Hartford documents as well as the former employee of one of the Investment Adviser Defendants discussed above in ¶ 128, in addition to the undisclosed directed brokerage payments, Defendants also made undisclosed revenue sharing payments to brokerage houses as part of the *quid pro quo* "shelf-space" arrangements.  In other words, Defendants paid the brokerage houses *cash* to push their clients into the Hartford Funds.

## Soft Dollars

133.    In addition to the undisclosed directed brokerage and revenue sharing payments, Defendants also used soft dollars to pay brokerages to push their clients into Hartford Funds. Soft dollars reflect the amount of a commission above the actual execution cost.  According to a

former Hartford Fund wholesaler who worked for Defendants during the Class Period, Defendants used soft dollars to pay for "shelf-space" at the brokerage houses.

### Meeting and Support Fees

134.    Defendants also regularly treated brokers who were pushing Hartford Funds to lavish vacations.  Such trips were sales rallies for Hartford Funds and Defendants sent teams of sales representatives to further pressure brokers into selling their funds.  According to a former Hartford wholesaler employed during the Class Period, incentives approved by senior level executives at Hartford were regularly provided to brokers.  For example, this former employee explained that Hartford regularly subsidized national sales meetings held at exotic locales by brokerage firms such as Smith Barney in order have such firms push Hartford Funds.

135.    According to the former employee referenced in ¶ 133 above, the top representatives who sold the most Hartford Funds were referred to as "Knights of the Roundtable."  As such, they would be treated to trips to Europe among other destinations. Contests to push specific Hartford Funds were held frequently, up to four times in a month. According to this ex-employee, senior Hartford executives instructed Hartford employees not to disclose any extra compensation to clients for pushing a particular fund.

### Defendants' Kickbacks Resulted in Conflicts of Interest

136.    According to a former Regional Sales Director who sold Hartford Funds during the Class Period, Hartford had two commission grids in place wherein those brokers selling Hartford Funds would receive substantially higher compensation than those that did not.

137.    Another former Regional Sales Manager who also sold Hartford Funds during the Class Period further explained that brokers were forced by management to push particular Hartford Funds regardless of whether or not the particular fund was appropriate for the client. Managers were encouraged to behave this way since, according to a former Regional Sales

46

Manager employed by Hartford during the Class Period, managers were paid extra for hitting

sales quotas for specific Hartford Funds rather than total sales. This former employee stated that

as a result of these payments by Hartford, clients were pushed into Hartford Funds which was

counter to the client's best interest, with the primary concern being only what was good for

Hartford's revenue. This former employee added that if one attempted to resist management's

directive to push certain Hartford Funds, that person would be castigated and threatened with

termination.

138.    Moreover, as stated in the January 9, 2004 *Wall Street Journal* article cited above,

the pressure to sell preferred funds such as the Hartford Funds made it financially foolhardy for

brokers to sell non-preferred funds. Quoting brokers who had sold only the preferred funds such

as the Hartford Funds for years, the article reported as follows:

> Individual brokers have a strong financial incentive to pitch
> favored funds. The revenue-sharing payments are credited as
> income to the profit-and-loss statements of brokerage branches.
> Those statements are a significant factor in determining the size of
> brokers' bonuses, generally awarded three times a year, according
> to former brokers. The bonuses can add up to $80,000 or $90,000
> for a good producer, and often average about a third of total
> compensation.
>
> *"I sold no outside funds,"* says former broker Eddie Hatch, who
> worked at Jones in North Carolina for 13 years, until he left in
> 2000 to work for another brokerage firm. *"You took a reduced
> payout" if you sold funds not on the preferred list, he adds.*
>
> Jones floods its brokers with literature from its preferred funds,
> former brokers say. "I didn't take the blinders off for nine years,"
> says Scott Maxwell of Cary, N.C., a broker who left Jones for
> another firm in March of last year. He switched jobs, he says,
> largely because he was uncomfortable with the limited fund
> selection. Mr. Maxwell says he wanted to be freer to offer clients
> funds with better investment performance and lower fees.
>
> Jeff Davis says he was "young and wet behind the ears" when he
> was hired at Jones in 1993 after a stint as a White House intern.
> *Even before he fully understood the financial incentives, he says
> he sold the seven funds almost exclusively. "I was afraid not to,"*

47

> he adds. Mr. Davis, who left Jones in 2001 and started his own
> business, also says he was uncomfortable with the incentives and
> wanted more leeway to sell other funds.

(Emphasis added.)

139.    The Investment Adviser Defendants paid excessive commissions and directed

brokerage business to broker-dealers who steered their clients into Hartford Funds as part of a

*quid pro quo* "shelf-space program" arrangement between Defendants and brokerages. Such

payments were used to fund sales contests and other undisclosed financial incentives to further

push Hartford Funds. These incentives created an undisclosed conflict of interest and caused

brokers to steer clients to Hartford Funds regardless of the funds' investment quality relative to

other investment alternatives and thereby to breach their duties of loyalty. As described by the

National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses
> commissions payable for executing the fund's securities trades to
> obtain a preferred position for the fund in the broker-dealer's
> distribution network. This practice creates numerous potential
> conflicts of interest, including possible incentives for broker-
> dealers to base their fund recommendations to customers on
> brokerage commission considerations rather than on whether a
> particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.htm.

140.    By paying the excessive commissions and directing brokerage business to

participate in "shelf-space programs," the Investment Adviser Defendants also violated Section

12 of the ICA, because such payments were not made pursuant to a valid Rule 12b-1 plan.

141.    Participation in shelf-space arrangements also created an undisclosed conflict for

the Investment Adviser Defendants. This conflict was also identified by the SEC during its

investigation: "As the Funds' advisers, [HIFSCO and its affiliate] benefited from these special

benefits because an increase in sales of Funds resulted in an increase in the investment

management fee [HIFSCO and its affiliate] received." SEC Hartford Order at *7-8.

## Defendants Cloaked Their Practices in Secrecy

142.    Defendants knew that these "shelf-space" arrangements presented a clear conflict of interest, pitting the financial interest of the broker against that of its clients.  Disclosure of this conflict is clearly material if clients are expected to make informed investment decisions. However, knowing that a recommendation to purchase the Hartford Funds would be completely undermined if clients knew that the broker was paid to give it, Defendants concealed the truth regarding these shelf-space arrangements.  Accordingly, Defendants went to great lengths to avoid creating a paper trail that could possibly expose these practices.  For instance, according to a former Hartford Regional Sales Manager who worked for Hartford during the Class Period, Hartford went out of its way to ensure that the agreements detailed above were not put in writing and were often developed at side meetings held at conferences.  Hartford employees were warned by management to refrain from talking about the revenue-sharing agreements.

## The Investment Adviser Defendants Charged Rule 12b-1 Fees in Excess of those Authorized under Rule 12b-1

143.    As discussed above, by paying the excessive brokerage commissions and directed brokerage, Defendants additionally violated Section 12 of the ICA, because such payments were not made pursuant to a valid Rule 12b-1 plan. *See* ¶¶ 82-85.

144.    The purported Rule 12b-1 fees charged to the Funds' investors were in violation of Rule 12b-1 because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as demonstrated above at ¶¶ 45-64, as each of the Funds was marketed and the number of fund investors increased, the economies of scale thereby created were not passed on to Hartford Funds investors.

145.    Moreover, at least three of the Hartford Funds were closed to new investors ("the Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been used to

market and distribute them.  Nevertheless, the Distributor Defendants received Rule 12b-1 fees charged to the Closed Funds.  The Closed Funds that charged such Rule 12b-1 fees are: Hartford MidCap Funds A, B and C.

146.    As set forth herein, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, Defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the Hartford Funds Rule 12b-1 plan.

### Use of "Soft Dollars" in Violation of Section 28(e)

147.    As discussed above, Investment Advisers routinely pay brokers commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  *See* ¶¶ 92-97.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price from their trades.

148.    As demonstrated above, however, the Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into Hartford Funds.  The Investment Adviser Defendants used Soft Dollars to pay for these excessive commissions that served as kickbacks to brokers thus charging Hartford Funds investors for costs not covered by the Section 28(e) safe harbor and that were not consistent with the Investment Advisers' fiduciary duties.

### The Prospectuses and SAIs Were Materially False And Misleading

149.    Plaintiffs and other members of the Class were entitled to, and did, receive one of the prospectuses (the "Prospectuses"), pursuant to which the Hartford Funds shares were offered.

150.    Prospectuses and SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

151.    Each of the Funds' Prospectuses and SAIs issued during the Class Period failed to disclose properly to investors material information about the mutual funds and the fees and costs associated with them. As shown below, each of the Funds' Prospectuses and SAIs contained the same materially false and misleading omissions regarding strategies for growth, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.

152.    Each of the Funds' Prospectuses and SAIs issued during the Class Period omitted substantially the same materially false and misleading information regarding the funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to invest in the Funds.

**Material Omissions Regarding Strategies for Growth**

153.    The December 15, 2003 Prospectus for the Hartford Advisers Fund is identical in substance to all Prospectuses issued during the Class Period in that it omits to state that one of the principal methods for increasing assets of the Funds was through participation in "shelf-space programs." It states:

> INVESTMENT GOAL. The Hartford Advisers Fund seeks
> maximum long-term total return.

This statement is materially false and misleading because it failed to disclose that one of the strategies of the Fund to increase assets was to pay brokers kickbacks to steer clients into the Funds, thereby growing Fund assets.

51

### Material Omissions Regarding Revenue Sharing

154.    The March 1, 2003 SAI for the Hartford Mutual Funds, Inc. and the Hartford

Mutual Funds II, Inc., which is incorporated by reference in all of the Prospectuses issued during

the Class Period, stated as follows with respect to its description of the distribution plan and

method by which it offered its shares to the public:

> HIFSCO and its affiliates pay, **out of their own assets,**
> compensation to brokers, financial institutions and other persons
> for the sale and distribution of the Companies' shares and/or for the
> servicing of those shares. These payments ("Additional Payments")
> may be made to supplement sales concessions (commissions)
> reallowed to dealers and/or portfolio brokerage directed in
> recognition of the sale of Fund shares. [emphasis added]

155.    Similarly, disclosure in the March 1, 2003 Prospectus for the Hartford Mutual

Funds, Inc. and the Hartford Mutual Fund II, Inc., which is substantially similar to disclosure in

all of the Funds' prospectuses issued during the Class Period, states under the heading

ADDITIONAL COMPENSATION TO BROKERS as follows:

> In addition to the commissions described above, the distributor
> pays additional compensation to dealers based on a number of
> factors described in the fund's statement of additional information.
> **This additional compensation is not paid by you.** [emphasis
> added]

156.    The above statements are materially false and misleading in that they failed to

disclose, *inter alia,* the following material adverse facts which damaged Plaintiffs and other

members of the Class:

(a)    that the Investment Adviser Defendants used investor assets to pay broker-

dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs

whereby the broker steered clients into Hartford Funds;

(b)    that the Investment Adviser Defendants used brokerage commissions over

and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)     that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds regardless of performance to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(d)     that the Investment Adviser Defendants compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

(e)     that such revenue sharing payments created undisclosed conflicts of interest;

(f)     that the Hartford Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the ICA because, among other reasons, the plan was not properly evaluated by the funds' Directors and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(g)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

(h)     that the Funds' Directors had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Funds.

157.    The disclosures referenced above that were contained in the Funds' Prospectuses and SAIs have specifically been found by the SEC to misrepresent the fact that Defendants did cause the Funds' shareholders to pay for the shelf-space programs at issue here. SEC Hartford Order at *8-9. Defendants' failures to make adequate disclosures of their revenue sharing and

53

directed brokerage practices, as described herein, was determined by the SEC to be a violation

of, *inter alia,* Section 34(b) of the ICA. *Id.* at paragraphs 33-34.

158.    The SEC has brought actions against other Investment Advisors for the same

behavior described above.  For example, as the SEC explained in its Administrative Proceeding

against Morgan Stanley in 2003:

> At issue in this matter are two distinct disclosure failures. The first
> relates to Morgan Stanley DW's operation of mutual fund
> **marketing programs in which it collected from a select group**
> **of mutual fund complexes amounts in excess of standard sales**
> **loads and Rule 12b-1 trail payments. These programs were**
> **designed to specially promote the sale of those mutual funds**
> **with enhanced compensation to individual registered**
> **representatives, known as financial advisors ("FAs"), and**
> **branch managers as well as increased visibility in its extensive**
> **retail distribution network.**

*See In the Matter of Morgan Stanley DW Inc.*, at paragraph 2, (November 17, 2003) *available at*

http://www.sec.gov/litigation/admin/33-8339.htm (emphasis added).

### Material Omissions Regarding Directed Brokerage Business

159.    The March 1, 2003 SAI for the Hartford Mutual Funds, Inc. and the Hartford

Mutual Fund II, Inc., which is incorporated by reference in all of the Hartford Funds

Prospectuses issued during the Class Period, stated under the heading PORTFOLIO

TRANSACTIONS AND BROKERAGE as follows:

> The Companies have no obligation to deal with any dealer or
> group of dealers in the execution of transactions in portfolio
> securities. Subject to any policy established by each Company's
> board of directors and HIFSCO, HIMCO and Wellington
> Management, as applicable, are primarily responsible for the
> investment decisions of each Fund and the placing of its portfolio
> transactions. In placing orders, it is the policy of each Fund to
> obtain the most favorable net results, taking into account various
> factors, including price, dealer spread or commission, if any, size
> of the transaction and difficulty of execution. While HIMCO and
> Wellington Management generally seek reasonably competitive
> spreads or commissions, the Funds do not necessarily pay the
> lowest possible spread or commission. Upon instructions from

HIFSCO, Wellington Management may direct certain brokerage transactions to broker/dealers who also sell shares of funds in the fund complex. Upon instructions from HIFSCO, Wellington Management may also direct certain brokerage transactions to broker/dealers that pay for certain other services used by the Funds.

Although the rules of the National Association of Securities Dealers, Inc. ("NASD") prohibit its members from seeking orders for the execution of investment company portfolio transactions on the basis of their sales of investment company shares, under such rules, sales of investment company shares may be considered by the investment company as a factor in selecting brokers to effect portfolio transactions. Accordingly, some portfolio transactions are, subject to such rules and to obtaining best prices and executions, executed through dealers who sell shares of funds in the fund complex.

160. The above statements are materially false and misleading in that they failed to disclose that Defendants chose brokers to execute sales of the Funds' portfolios - and thereby directed the commissions from the sales of the portfolios securities to these brokers - to satisfy negotiated arrangements with brokerages to give Defendants "shelf-space" visibility and to push their clients in Hartford Funds in exchange for directed brokerage. Additionally, the above statements were materially false and misleading in that they failed to disclose, *inter alia,* the following material adverse facts which damaged Plaintiffs and other members of the Class:

(a) that the Investment Adviser Defendants used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Hartford funds;

(b) that the Investment Adviser Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c) that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds to satisfy bilateral arrangements with brokerages pursuant to

"shelf-space programs" and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

    (d)    that the Hartford Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of ICA because, among other reasons, the plan was not properly evaluated by the Funds' Directors and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

    (e)    that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

    (f)    that such revenue sharing payments created undisclosed conflicts of interest;

    (g)    that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

    (h)    that the Funds' Directors had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Hartford Funds.

161.    The SEC has specifically found that the Defendants' disclosure of its use of directed brokerage was inadequate: "specifically, the Retail Funds' SAI ... stated that they may direct brokerage commissions to broker-dealers who sold shares of the Retail and HLS Funds. *These representations are misleading*." SEC Hartford Order at *13 (emphasis added.)

162.    The SEC has also brought actions against other Investment Advisers regarding

this behavior. As stated in an Administrative Proceeding against Massachusetts Financial

Services, Inc. ("MFS"):

> **MFS did not adequately disclose to MFS shareholders that it**
> **allocated fund brokerage commissions to satisfy strategic**
> **alliances.**
>
> Specifically, Item 16(c) of the Form N-1A requires a description in
> the SAI of "how the Fund will select brokers to effect securities
> transactions for the Fund" and requires that "[i]f the Fund will
> consider the receipt of products or services other than brokerage or
> research services in selecting brokers, [the Fund should] specify
> those products or services."
>
> *                *                *
>
> **The SAIs did not adequately disclose to shareholders that MFS**
> **had entered into bilateral arrangements in which it agreed to**
> **allocate specific negotiated amounts of fund brokerage**
> **commissions, subject to best execution, to broker-dealers for**
> **"shelf-space" or heightened visibility within their distribution**
> **systems.**

*See In the Matter of Massachusetts Financial Services Company*, at paragraphs 21-24, (March

31, 2004) *at* http://www.sec.gov/litigation/admin/ia-2224.htm (emphasis added).

## Material Omissions Regarding 12b-1 Fees

163.    The March 1, 2003 SAI for the Hartford Mutual Funds, Inc. and the Hartford

Mutual Fund II, Inc. which is incorporated by reference in all of the Hartford Funds Prospectuses

issued during the Class Period, stated as follows with respect to 12b-1 fees:

> General Distribution fees paid to HIFSCO may be spent on any
> activities or expenses primarily intended to result in the sale of the
> applicable Company's shares including: (a) payment of initial and
> ongoing commissions and other compensation payments to
> brokers, dealers, financial institutions or others who sell each
> Fund's shares, (b) compensation to employees of HIFSCO, (c)
> compensation to and expenses, including overhead such as
> communications and telephone, training, supplies, photocopying
> and similar types of expenses, of HIFSCO incurred in the printing
> and mailing or other dissemination of all prospectuses and

statements of additional information, (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, i.e., advertisements and sales literature, and (e) other distribution-related expenses and for the provision of personal service and/or the maintenance of shareholder accounts. These plans are considered compensation type plans which means that the Funds pay HIFSCO the entire fee regardless of HIFSCO's expenditures.

164.    The above statements are materially false and misleading in that they fail to state that Defendants used 12b-1 fees to participate in "shelf-space programs" to provide kickbacks to brokers for directing their clients into Hartford Funds.  Additionally, the above statements are materially false and misleading in that they failed to disclose *inter alia,* the following material adverse facts which damaged Plaintiffs and other members of the Class:

(a)    that the Investment Adviser Defendants used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Hartford funds;

(b)    that the Investment Adviser Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)    that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(d)    that the Hartford Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the ICA because, among other reasons, the plan was not properly evaluated by the funds' Directors and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

58

(e)     that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

(f)     that such revenue sharing payments created undisclosed conflicts of interest;

(g)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

(h)     that the funds' Directors had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Hartford Funds.

### **Material Omissions Regarding Soft Dollars**

165.    The March 1, 2003 SAI for the Hartford Mutual Funds, Inc. and the Hartford Mutual Fund II, Inc., which is incorporated by reference in all of the Hartford Funds Prospectuses issued during the Class Period, stated as follows with respect to Soft Dollars:

> While HIMCO and Wellington Management seek to obtain the most favorable net results in effecting transactions in a Fund's portfolio securities, broker-dealers who provide investment research to HIMCO or Wellington Management may receive orders for transactions from HIMCO or Wellington Management. Such research services ordinarily consist of assessments and analyses of the business or prospects of a company, industry, or economic sector. If, in the judgment of HIMCO or Wellington Management, a Fund will be benefited by such research services, HIMCO and Wellington Management are authorized to pay spreads or commissions to brokers or dealers furnishing such services which are in excess of spreads or commissions which another broker or dealer may charge for the same transaction. Information so received is in addition to and not in lieu of the services required that HIMCO and Wellington Management must perform under the investment advisory agreement or the

59

investment subadvisory agreement. The expenses of HIMCO and
Wellington Management are not necessarily reduced as a result of
the receipt of such information.

166.     The above statements are materially false and misleading in that they failed to
disclose, *inter alia,* the following material adverse facts regarding Soft Dollars which damaged
Plaintiffs and other members of the Class:

(a)     that the Investment Adviser Defendants used investor assets to pay broker-
dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs
whereby the broker steered clients into Hartford Funds;

(b)     that the Investment Adviser Defendants used brokerage commissions over
and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)     that the Investment Adviser Defendants directed brokerage payments to
firms that favored Hartford Funds to satisfy bilateral arrangements with brokerages pursuant to
"shelf-space" programs and that this directed brokerage was a form of marketing that was not
disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(d)     that the Investment Adviser Defendants and/or the Distributor Defendants
compensated themselves out of investor assets for any payments made pursuant to revenue
sharing agreements;

(e)     that such revenue sharing payments created undisclosed conflicts of
interest;

(f)     that the Hartford Funds Rule 12b-1 Plans were not in compliance with
Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the
ICA because, among other reasons, the plan was not properly evaluated by the funds' Director
and there was not a reasonable likelihood that the plan would benefit the company and its
shareholders;

60

(g)    that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

(h)    that the Director Defendants had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Hartford Funds.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

167.    With the exception of Count III, Plaintiffs bring these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units, or like interests in any of the Funds between January 30, 1999 through November 17, 2003, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

168.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Hartford Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

169.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

170.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

171.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether Defendants violated the ICA as alleged herein;

      (b)    whether Defendants omitted to disclose to the investing public during the Class Period material facts about the business and operations of the Funds; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

172.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### AGAINST THE INVESTMENT ADVISER DEFENDANTS FOR VIOLATIONS OF SECTION 34(b) OF THE ICA ON BEHALF OF THE CLASS

173.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

174.    This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Hartford Funds for their role in the creation of the materially false and misleading Prospectuses.

175.    The Investment Adviser Defendants omitted to state facts necessary to prevent statements in registration statements and reports filed and disseminated pursuant to the ICA, in light of the circumstances under which they were made, from being materially false and misleading. The Investment Adviser Defendants failed to disclose, *inter alia,* the following:

(a)    that the Investment Adviser Defendants used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Hartford funds;

(b)    that the Investment Adviser Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)    that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(d)    that the Hartford Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the ICA because, among other reasons, the plan was not properly evaluated by the funds' Directors

63

and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e)     that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

(f)     that such revenue sharing payments created undisclosed conflicts of interest;

(g)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

(h)     that the funds' Directors had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Hartford Funds.

176.    By reason of the conduct described above, the Investment Adviser Defendants violated Section 34(b) of the ICA.

177.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' violation of Section 34(b) of the ICA, Hartford Funds investors have incurred damages.

178.    Plaintiffs and other members of the Class have been specially injured by Defendants' violations of Section 34(b) of the ICA. Such injuries were suffered directly by shareholders, rather than by the Hartford Funds themselves.

179.    The Investment Adviser Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### AGAINST THE DISTRIBUTOR DEFENDANTS AND THE INVESTMENT ADVISER DEFENDANTS PURSUANT TO SECTION 36(a) OF THE ICA ON BEHALF OF THE CLASS

180.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181.    This Count is brought against the Distributor Defendants and the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(a) of the ICA.

182.    The Distributor Defendants and the Investment Adviser Defendants had a fiduciary duty to the Class. The Distributor Defendants and the Investment Adviser Defendants violated Section 36(a) by breaching their fiduciary duties to the Funds by (1) drawing on the assets of Hartford Funds investors to meet their undisclosed revenue sharing commitments through the use of directed brokerage, Soft Dollars and excessive commissions, as defined herein; (2) charging excessive advisory and 12b-1 fees; and (3) omitting to state the following facts which were necessary to prevent statements in registration statement and reports filed and disseminated pursuant to the ICA, in light of the circumstances under which they were made, from being materially false and misleading:

(a)    that the Investment Adviser Defendants used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Hartford Funds;

(b)    that the Investment Adviser Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

65

(c)  that the Investment Adviser Defendants directed brokerage payments to firms that favored Hartford Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Hartford Funds Rule 12b-1 Plan;

(d)  that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

(e)  that such revenue sharing payments created undisclosed conflicts of interest;

(f)  that the Hartford Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the ICA because, among other reasons, the plan was not properly evaluated by the funds' Director and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(g)  that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Fund investors continued to increase; and

(h)  that the Director Defendants had abdicated their duties under the ICA and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Hartford Funds.

183.  By reason of the conduct described above, the Distributor Defendants and the Investment Adviser Defendants violated Section 36(a) of the ICA.

184.    As a direct, proximate and foreseeable result of the Distributor Defendants' and the Investment Adviser Defendants' breaches of fiduciary duties in their roles as principal underwriters and investment advisers, respectively, to Hartford Funds investors, the Class has incurred millions of dollars in damages.

185.    Plaintiffs, in this count, seek to enjoin Defendants from engaging in such practices in the future as well as recover the excessive Rule 12b-1 fees, Soft Dollars, excessive commissions, directed brokerage and the management fees charged to the Hartford Funds by the Distributor Defendants and the Investment Adviser Defendants.

## COUNT III

### AGAINST THE DISTRIBUTOR DEFENDANTS AND INVESTMENT ADVISER DEFENDANTS PURSUANT TO SECTION 36(b) OF THE ICA ON BEHALF OF THE 36(B) FUNDS

186.    The 36(b) Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein with the exception of the class action allegations at ¶¶ 167 to ¶¶ 172.

187.    This Count is brought on behalf of the 36(b) Funds against the Distributor Defendants and Investment Adviser Defendants for breach of their fiduciary duties with respect to compensation as defined by Section 36(b) of the ICA.  Section 36(b) does not require Plaintiffs to make a demand on the 36(b) Funds' Directors before bringing a claim.

188.    Defendants in this Count each had a fiduciary duty to the 36(b) Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to such Defendants.

189.    As alleged above, the fees received by the Distributor and Investment Adviser Defendants were excessive, in that they were so disproportionately large that they bore no reasonable relationship to the services rendered and would not have been negotiated in an arm's-length relationship.

190.   By reason of the conduct described above, the Distributor and Investment Adviser Defendants violated § 36(b) of the ICA.  As a direct, proximate and foreseeable result of the Distributor and Investment Adviser Defendants' breaches of fiduciary duties in their roles as principal underwriters and investment advisers, respectively, to the Hartford Funds and their investors, the 36(b) Funds and their investors have sustained many millions of dollars in damages.

191.   Plaintiffs, in this count, seek to recover for the 36(b) Funds, the excessive advisory, Rule 12b-1, and other fees charged to the 36(b) Funds and their investors by Defendants and their affiliates.

## COUNT IV

### AGAINST HARTFORD (FOR CAUSING THE DISTRIBUTOR DEFENDANTS AND THE INVESTMENT ADVISER DEFENDANTS TO VIOLATE THE ICA) AND THE INVESTMENT ADVISER DEFENDANTS (FOR CAUSING THE DISTRIBUTOR DEFENDANTS TO VIOLATE THE ICA) FOR VIOLATION OF SECTION 48(a) OF THE ICA

192.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein with the exception of the class action allegations at ¶¶ 167 to ¶¶ 172 insofar as this Count relates to Section 36(b) of the ICA.

193.   This Count is brought pursuant to Section 48(a) of the ICA against Hartford for directly and/or indirectly causing the Distributor Defendants and Investment Adviser Defendants to commit the violations of the ICA alleged herein.

194.   The Distributor Defendants are liable under Sections 36(a) and 36(b) of the ICA as set forth herein.

195.   The Investment Adviser Defendants are liable under Sections 34(b), 36(a) and 36(b) of the ICA as set forth herein.

196.    Hartford directly and/or indirectly caused the Investment Adviser and Distributor Defendants to engage in the violations of the ICA alleged herein. The Investment Adviser Defendants directly and/or indirectly caused the Distributor Defendants to engage in the violations of the ICA alleged herein.

197.    Pursuant to Section 48(a) of the ICA, by reason of the foregoing, Hartford is liable to Plaintiffs and the Class to the same extent as are the Distributor Defendants and the Investment Adviser Defendants for their primary violations of Sections 34(b) and 36(a) of the ICA. In addition, pursuant to Section 48(a) of the ICA, Hartford is liable to the 36(b) Funds to the same extent as the Distributor and Investment Adviser Defendants for their violations of Section 36(b) of the ICA. Finally, the Investment Adviser Defendants are liable to Plaintiffs and the Class to the same extent as the Distributor Defendants for their violations of Section 36(a) of the ICA, and to the 36(b) Funds to the same extent as the Distributor Defendants for their violations of Section 36(b) of the ICA.

198.    By virtue of the foregoing, the 36(b) Funds, Plaintiffs and other Class members are entitled to damages against Hartford and the Investment Adviser Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages to the 36(b) Funds against Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of Sections 36(b) and 48(a) of the ICA, in an amount to be proven at trial, including interest thereon;

B.      Awarding compensatory damages to Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of Sections 34(b), 36(a) and 48(a) of the ICA, in an amount to be proven at trial, including interest thereon;

C.      Awarding the 36(b) Funds injunctive relief ordering Defendants to cease the charging of excessive fees;

D.      Ordering an accounting of all Fund related fees, commissions, and Soft Dollar payments;

E.      Ordering restitution of all excessive fees and charges;

F.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury for all claims other than those under Section 36(b) of the ICA.

THE PLAINTIFFS

By:

J. Daniel Sagarin (CT 04289)
David A. Slossberg (CT 13116)
**HURWITZ, SAGARIN, SLOSSBERG &
KNUFF, LLC**
147 North Broad Street
P.O. Box 112
Milford, CT 06460
Tel.:   (203) 877-8000

*Co-Liaison Counsel*

Andrew M. Schatz (CT 00603)
Jeffrey S. Nobel (CT 04855)
**SCHATZ NOBEL IZARD, P.C.**
20 Church Street, Suite 1700
Hartford, CT 06103
Tel.:   (860) 493-6292

*Co-Liaison Counsel*

70

Jerome M. Congress
Janine L. Pollack
**MILBERG WEISS & BERSHAD LLP**
One Pennsylvania Plaza
New York, NY 10119
Tel.:   (212) 594-5300

*Lead Counsel and Chair of the Executive*
*Committee*

Marc A. Topaz
Richard A. Maniskas
**SCHIFFRIN BARROWAY TOPAZ &**
**KESSLER, LLP**
280 King of Prussia Road
Radnor, PA   19087
Tel.:   (610) 667-7706

*Member of the Executive Committee*

Jules Brody
Mark Levine
**STULL STULL & BRODY**
6 East 45th Street
Suite 500
New York, NY  10017
Tel.:   (212) 687-7230

*Member of the Executive Committee*

Eric J. Belfi
Brian P. Murray
**MURRAY, FRANK & SAILER LLP**
275 Madison Avenue
New York, NY  10016
Tel.:   (212) 682-1818

*Member of the Executive Committee*

David R. Scott (CT 16080)
Erin Green Comite (CT 24886)
**SCOTT + SCOTT, LLC**
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Tel.:   (800) 404-7770

*Member of the Executive Committee*

Michael M. Goldberg
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150

Joseph H. Weiss
**WEISS & LURIE**
551 Fifth Avenue
New York, NY 10176
Tel.: (212) 682-3025

Charles J. Piven
Marshall N. Perkins
**BROWER PIVEN, A PROFESSIONAL**
**CORPORATION**
The World Trade Center – Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Tel.: (410) 332-0030

*Additional Plaintiffs' Counsel*

## Exhibit A
### Fund Expenses in Dollar Amounts

For the Year Ended October 31, 2003

| Name of Fund | Total Net* Expenses ($ millions) | Advisory Fees** ($ millions) | 12B-1 Fees** ($ millions) |
|---|---|---|---|
| Hartford Advisers Fund | 38.95 | 14.96 | 14.07 |
| Hartford Dividend and Growth Fund | 22.89 | 9.71 | 7.25 |
| Hartford MidCap Fund | 29.63 | 13.00 | 9.90 |
| Hartford Stock Fund | 27.42 | 11.36 | 9.42 |
| Hartford Capital Appreciation Fund | 63.92 | 24.73 | 23.37 |
| **Total Dollar Expenses** | 182.80 | 73.76 | 64.01 |

For the Year Ended October 31, 2004

| Name of Fund | Total Net* Expenses ($ millions) | Advisory Fees** ($ millions) | 12B-1 Fees** ($ millions) |
|---|---|---|---|
| Hartford Advisers Fund | 38.31 | 16.54 | 14.70 |
| Hartford Dividend and Growth Fund | 31.84 | 14.71 | 10.64 |
| Hartford MidCap Fund | 40.27 | 18.71 | 13.78 |
| Hartford Stock Fund | 29.15 | 12.40 | 9.78 |
| Hartford Capital Appreciation Fund | 95.92 | 40.22 | 35.61 |
| **Total Dollar Expenses** | 235.49 | 102.58 | 84.51 |

*after any applicable waivers
**prior to any applicable waivers